ESTATE OF Gerald L. WALLACE, Deceased, Celia A. Wallace, Executrix, and Celia A. Wallace, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 91–7318.

United States Court of Appeals, Eleventh Circuit.

July 13, 1992.

Roland J. Mestayer, Jr., Megehee, Mestayer, Kinard & Smith, P.A., Pasacagoula, Miss., Norman A. Lofgren, Clark S. Willingham, Mankoff, Hill, Held & Goldburg, P.C., Dallas, Tex., for petitioners-appellants.

Robert D. Forrester, Gibson, Ochsner & Adkins, L.L.P., Amarillo, Tex., for amicus.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Gary R. Allen, Chief, Joan J. Oppenheimer, Brian C. Griffin, Appellate Section, Tax Div., Washington, D.C., for respondent-appellee.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Plaintiffs–Appellants Gerald L. Wallace ("Wallace"), deceased, and Celia A. Wallace, his wife and executrix, appeal from a tax court decision upholding the IRS's finding of tax deficiencies against the Wallaces for the years 1980 and 1983. The tax court ruled that the Wallaces were not entitled to deduct the entire cost of feed for their cattle-feeding business in the year in which the feed was purchased, and could only deduct the cost in the year the feed was actually consumed because, under 26 U.S.C. § 464, Wallace was a limited entrepreneur who did not "actively participate" in the management of his cattle-feeding enterprise. We affirm.

## BACKGROUND

Wallace, who died in 1986, was a physician who throughout his medical career also engaged in a number of successful business and investment ventures.[1] These ventures included developing residential property in St. Thomas, the American Virgin Islands; purchasing land in Mobile County, Alabama on which a producing oil well was drilled; constructing a hospital, a medical office building, and a nursing home in Mobile County; building an office building and schools in Baldwin County, Alabama; engaging in the commercial fishing business through the ownership of shrimp

---

1. Dr. and Mrs. Wallace filed joint income tax returns and, to some extent, participated together in all these ventures, including the cattle-feeding business. For brevity and clarity, we will refer only to Dr. Wallace, who made all the ultimate decisions with respect to the cattle-feeding business.

boats; operating a natural gas transmission company; and owning a hotel.

In 1979, with no background in farming, Wallace became involved in the cattle-feeding business. He engaged in the business continuously from 1980 to 1985, taking out loans to finance the venture and reinvesting profits in more cattle. According to the tax court, "The term 'cattle feeding' applies to the practice of placing cattle in feedlots, feeding the cattle a high protein diet for 3 to 5 months, and then selling the cattle for slaughter." *Estate of Wallace v. Commissioner*, 95 T.C. 525, 529 (1990). The tax court found that:

> [t]he feedlot employees include the feedlot manager, clerical staff, office manager, cowboy-foreman, cowboys, lay doctor, processors, market monitors, and a food mill expert. In addition to employees, a commercial feedlot usually has a nutritionist and a veterinarian as consultants.
>
> The feedlot employees care for the cattle from the moment the cattle are delivered to the feedlot until the moment they are sold for slaughter. Care of the cattle includes daily feeding, maintenance of the cattle's health, treatment of disease, and other activities necessary for the cattle to adequately gain weight during the feeding period. Cattle in the feedlot are segregated into separate pens according to owner, but all cattle in the feedlot at a given time and at a given stage of development are treated exactly the same.
>
> The ultimate authority in a commercial feedlot is the feedlot manager. The feedlot manager and supervisors make all the decisions regarding the hiring and firing of employees on the feedlot. Individual cattle owners have no authority to hire or fire any employees. If an owner is displeased with the treatment his cattle receive at a particular feedlot, he can speak with the feedlot manager or operator in an attempt to work out a solution, take his complaint to arbitration or to court, or simply move his cattle to another feedlot. Generally, if the owner is dissatisfied with a feedlot, when he pur-

> chases his next set of cattle he will place those cattle with another feedlot. It is considered very unusual to move cattle from one feedlot to another during their feeding cycle, because it throws the cattle off feed and adds freight charges.
>
> Commercial feedlots offer cattle owners marketing services. The feedlot will place fat cattle on a show list for viewing by packers/buyers who usually visit the feedlots daily. In many instances, the feedlot manager will negotiate a sale of cattle to the packer/buyer from the cattle owner.

*Wallace*, 95 T.C. at 529–30. The majority of cattle in the United States are fed in commercial feedlots.[2] Whether the owners of the cattle are doctors living hundreds of miles away or ranchers living nearby, they have no control over how the feedlot is operated.

Cattle feeding has been engaged in by cow-calf producers, stocker-operators, and others interested in the business largely for its profit potential. Cattle feeding also has been well known as a tax deferral shelter for professionals and other high-income individuals, who took advantage of a special tax rule allowing farmers to deduct the entire cost of certain expenses, such as cattle feed, in the year purchased, rather than in the year consumed. Wealthy taxpayers used this special tax rule to prepay farm expenses and take large deductions against nonfarm income in the first year, and in subsequent years, of a farming venture. Congress enacted 26 U.S.C. § 464 in 1976 to exclude farming syndicates from this special tax advantage. The Senate Report of the Committee on Finance for the Tax Reform Act of 1976 explained that:

> [u]nder present law [before the passage of section 464], farm operations are governed by special tax rules, many of which confer tax benefits on farming activities and on persons who engaged in farming. Under present law [before section 464], the special tax rules available to farmers

---

**2.** The parties stipulated at trial that 30% of cattle in the United States are fed on ranches instead of feedlots.

can be utilized by both full-time farmers and by high-bracket taxpayers who participate in farming as a sideline. . . . The special inventory exception for farmers was adopted by administrative regulation more than fifty years ago. The primary justification for this exception was the relative simplicity of the cash method of accounting which, for example, eliminates the need to identify specific costs incurred in raising particular animals.

The Treasury has also long permitted farmers to deduct currently many of the costs of raising or growing farm assets . . . which are used in the trade or business of farming. (In similar nonfarming businesses, such as manufacturing, these costs generally are treated as capital expenditures and are depreciated over their useful lives.)

S.Rep. No. 938, 94th Cong., 2d Sess. 51–52 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3439, 3487, 3488 (footnotes omitted).[3]

In 1980, the year Wallace entered the cattle-feeding business, his tax return showed nonfarm income in excess of $1,000,000. Wallace deducted $473,000 in farm losses, the great majority of which was the cost of prepaid cattle feed to be used in future years, lowering his adjusted gross income to $654,000. In 1983, Wallace earned in excess of $2,800,000 in nonfarm income and deducted roughly $1,500,000 in farm losses, again mostly for prepaid feed, lowering his adjusted gross income to roughly $1,400,000. Citing 26 U.S.C. § 464, the IRS disallowed most of these deductions.

The House and Senate Reports for the Tax Reform Act of 1976 discussed some of the characteristics of cattle feeding as a tax deferral shelter that led to passage of section 464:

> Cattle feeding offers one of the best known and, until recent downturns in the farm economy, most widely used deferral shelters. Typically, the investment is organized as a limited partnership or as an agency relationship (under a management contract) in which a commercial feedlot or a promoter agrees to act as an agent for the investor in buying, feeding and managing cattle. After being fed a specialized diet for four to six months, the fattened cattle are sold at public auction to meat packers or food companies. A cattle feeding venture of this kind is typically formed in November or December, using leveraging and the cash method of accounting to permit taxpayers with income from other sources to defer taxes otherwise due on that income in that year by deducting expenses for prepaid feed, interest, and other costs incurred in the feeding venture. Income is realized in the following year when the fattened cattle are sold. At that time, the bank loans are repaid and any unpaid fees due the feedlot (or promoter) are deducted. The balance is distributed to the investors. Since feeder cattle are held for sale to customers, sale of the animals produce ordinary income. If the investors were to reinvest their profit from one feeding cycle into another one, they could theoretically defer taxes indefinitely on the nonfarm income which they sheltered originally.

> Since most investors in cattle feeding shelters buy in at the end of the calendar year, deductions for prepaid feed for the cattle have been central to the creation of tax losses in that year.

S.Rep. No. 938, 94th Cong., 2d Sess. 56 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3439, 3492; H.Rep. No. 658, 94th Cong., 1st Sess. 42 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 2936 (footnote omitted.)[4]

After Wallace decided to enter the cattle-feeding business, he hired Joe Haynes ("Haynes") to advise him. Haynes advised several clients in the business. Haynes's

---

**3.** The Senate Report noted that farmers do not enjoy the special tax benefits when purchasing livestock or making certain capital expenditures such as for farm machinery, land, and buildings. *Id.*

**4.** There are also, however, sound business reasons for purchasing feed at the end of the year. After the harvest, feed is less expensive, and prepurchasing feed enables the taxpayer to fix costs and project what is needed to make a profit.

function was to give Wallace advice and execute Wallace's orders. This included buying cattle that were not yet fattened, placing them in feedlots, and selling them fattened at the appropriate time. Decisions undertaken by Wallace, with Haynes's advice, were essentially investment decisions—when to buy, when to sell, and how to finance. Appellants maintain that the decision whether to prepurchase feed was another of Wallace's responsibilities.[5] On at least one occasion, Wallace rejected Haynes's advice on when to sell, correctly anticipating a rise in market price.

Wallace did, however, have some contact with the feeding end of the business. On one occasion he moved cattle from one feedlot to another during the feeding cycle—a move considered unusual because of the extra expense involved—due to dissatisfaction with the feedlot operator's performance. Wallace and Haynes discussed the advantages of different feedlots. As Wallace's agent, Haynes would telephone the feedlot manager three or four times a week during the three-to-five-month feeding cycle. Wallace himself would speak personally to the feedlot manager two or three times during a cycle. Over the course of six years, Wallace visited feedlots between two and six times, always while en route to other business destinations.

To finance his cattle-feeding venture, Wallace took out loans from Production Credit Associations (PCAs), which are rural banks established by the federal government to finance agricultural projects at competitive interest rates.[6] As part of his loan agreements, Wallace was obligated to "hedge" a portion of his cattle. According to *amicus curiae* National Cattlemen's Association:

> Hedging is the process of utilizing the commodities futures market contracts to manage market price risks. For example, a cattle feeder who owns cattle that he expects to have ready for market in April 1992 may sell a live cattle contract on the Chicago Mercantile Exchange in October 1991 when he purchases the light-weight feeder animal. This futures contract legally obligates the cattle owner to deliver 40,000 pounds of a specified grade and quality to the futures contract buyer during April 1992. The price per pound is agreed upon.

Thus, once Wallace projected what his total costs and the cattle's weight gain would be, he could decide whether he could sell a futures contract at a profit, a loss, or break-even. According to expert testimony in the tax court record, it is rare for an owner to hedge at a profit, that is, to lock in a profitable price on the futures market. Rather, hedging is generally used to limit the risk of loss. Therefore, it is also rare for an owner to hedge one hundred percent of his or her cattle. In 1980 and from time to time in subsequent years, Wallace was one hundred percent hedged. At all times, he was hedged to the extent that he could lose no more than $200,000 on the fluctuating price of beef. Hedging could only ensure a limitation on losses related to the market, however. If Wallace's cattle came in underweight and he could not sell the amount of beef that he had previously projected, hedging would not limit his losses.

The IRS determined that Wallace was a farming syndicate under the statutory definition, and it disallowed the tax deferral benefit he received for feed purchased in one year but not consumed in that year. Mrs. Wallace and the Wallace estate petitioned the tax court, which agreed that Wallace was a farming syndicate because he was a limited entrepreneur who did not actively participate in his farming enterprise.

## DISCUSSION

■ The issue on appeal is whether Wallace could deduct the entire cost of prepaid

---

5. Because the significant tax advantages of pre-purchasing feed has been a major lure of affluent taxpayers to the cattle-feeding business, one assumes that this decision was not a difficult one.

6. Thus, Wallace's tax losses from the cattle business did not actually come out of his income but were instead covered by loans.

cattle feed in the year of purchase, and involves the application of a set of factors found in the legislative history of 26 U.S.C. § 464 for determining whether a taxpayer "actively participate[s]" in a farming enterprise. A taxpayer who does not actively participate in the farming enterprise is not entitled to use the special farm tax rule. That Wallace engaged in cattle feeding for a profit is not disputed and is not relevant to the disposition of this case. If Wallace did not engage in cattle feeding for a profit, his deductions would have been limited under 26 U.S.C. § 183, titled "activities not engaged in for a profit." The IRS does not contend that Wallace is prohibited from deducting cattle-feeding expenses against other income. The sole issue before us is *when* Wallace may deduct the cost of the feed.[7]

The definition of "actively participate" under section 464 is a question of first impression in the circuit courts. Section 464(a) states:

> In the case of any farming syndicate (as defined in subsection (c)), a deduction (otherwise allowable under this chapter) for amounts paid for feed, seed, fertilizer, or other similar farm supplies shall only be allowed for the taxable year in which such feed, seed, fertilizer, or other supplies are actually used or consumed, or, if later, for the taxable year for which allowable as a deduction (determined without regard to this section).

Section 464(c)(1)(B) defines a farming syndicate as:

> a partnership or any other enterprise other than a corporation which is not an S corporation engaged in the trade or business of farming, if more than 35 percent of the losses during any period are allocable to limited partners or limited entrepreneurs.

Section 464(e)(2) defines a limited entrepreneur as:

> a person who—
> (A) has an interest in an enterprise other than as a limited partner, and

(B) does not *actively participate* in the management of such enterprise.

(Emphasis added.)

The tax court summarized the positions of the parties:

> The parties agree that Dr. Wallace was engaged in the trade or business of farming, that all losses of the cattle business (and therefore over 35 percent of the losses) were allocable to Dr. Wallace, and that the interest of Dr. Wallace in the cattle business was other than as a limited partner. The parties do not agree as to whether Dr. Wallace actively participated in the management of the cattle business. The parties agree that if Dr. Wallace actively participated in the cattle enterprise, he is not a limited entrepreneur and if he is not a limited entrepreneur, his cattle business is not a farming syndicate as defined in section 464. The parties also agree that if Dr. Wallace's cattle enterprise does not come within the definition of a farming syndicate, he is entitled to deduct the cost of all cattle feed purchased in the year of purchase. If that enterprise is a farming syndicate under the provisions of section 464, he is only entitled to deduct the cost of the feed purchased in the year it is consumed.

*Wallace*, 95 T.C. at 543–44.

Appellants argue that the tax court erred in defining the enterprise by which to measure Wallace's participation as feeding cattle rather than buying and selling—as well as feeding—cattle, and that if the tax court had used this broader definition of farming, the court would have found that Wallace actively participated in the management of his farming enterprise. They claim that defining the business as cattle feeding would lead to the absurd conclusion that every owner who uses but does not manage a commercial feedlot is a farming syndicate. Appellants also argue that the tax court wrongly analyzed one of the factors, found in the legislative history of section 464, for determining active partic-

---

7. A subsequent revision of the Tax Code that does not affect this case mandates that farming syndicates use the accrual method of accounting rather than the cash method. *See* 26 U.S.C. § 461(i).

ipation, finding incorrectly that Wallace had limited liability.[8] The IRS contends that the tax court correctly defined the relevant enterprise as feeding cattle, and that statutory exceptions—listed in section 464(c)(2)—ensure that real farmers who use commercial feedlots are not considered farming syndicates. The IRS also contends that the tax court correctly evaluated all the factors found in the legislative history, including the limited liability factor.

## I. *Standard of Review*

The parties do not challenge the tax court's findings concerning the underlying, or subsidiary, facts in this case.[9] We review a trial court's findings of ultimate facts under a clearly erroneous standard. *See Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Matthews v. United States*, 713 F.2d 677, 681 (11th Cir.1983). However, "[t]he Tax Court's rulings on the interpretation and application of the statute are conclusions of law subject to *de novo* review," *Young v. Commissioner*, 926 F.2d 1083, 1089 (11th Cir.1991), and the tax court's "[f]indings of ultimate fact which result from the application of legal principles to subsidiary facts are subject to *de novo* review." *Walter v. Commissioner*, 753 F.2d 35, 38 (6th Cir.1985). We review *de novo* the tax court's (1) application of the facts to the factors found in the legislative history; (2) interpretation of section

464's definition of farming; and (3) determination, based on its weighing of the factors, that Wallace did not actively participate in his farming enterprise.

## II. *Whether Wallace Actively Participated in his Cattle–Feeding Enterprise*

The statutory language of section 464 is silent about the meaning of "actively participate." The legislative history, however, sets out factors that indicate whether a taxpayer actively participates in his or her farming enterprise. If a statute "is in any way ambiguous, then the court must consider the statute's legislative history." *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1559 (11th Cir.1989). *See Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

According to the House Conference Report for the Tax Reform Act of 1976:

The determination of whether a person actively participates in the operation or management of a farm depends upon the facts and circumstances. Factors which tend to indicate active participation include participating in the decisions involving the operation or management of the farm, actually working on the farm, living on the farm, or hiring and discharging employees (as compared to only the farm manager). Factors which tend to indicate a lack of active participation include lack of control of the manage-

---

**8.** Appellants also contend that Wallace's level of participation would qualify under other provisions in other sections of the tax code. Appellants cite to the following provisions: "material participation" in section 469, concerning passive-activity losses; "active participation" in section 469, concerning rental real estate activities; "active participation" and "material participation" in section 2032A, concerning valuation for real estate tax purposes of certain farm property; and "material participation" in section 1402, concerning self-employment income. They argue that because, in their view, Wallace's participation would be considered sufficient under these other code sections, we should consider that he qualifies as an active participant under section 464. We disagree that the standards for active or material participation in these other code sections have any relevance to the determination of the meaning of "actively participate" in section 464. First, and most impor-

tantly, the legislative history of section 464 unambiguously sets out factors to be considered in determining whether a taxpayer actively participates in the management of his or her farming enterprise, and there is therefore no need to look elsewhere for the definition. Second, there is no indication in the statutory scheme that Congress intended that terms from these code sections are to be read in conjunction with one another. Finally, section 464 is not merely concerned with a taxpayer's level and type of participation in *any* business or activity, but with a taxpayer's level and type of participation in *farming* in particular; there is thus no indication that a standard taken from a statute with a different purpose would be relevant.

**9.** The parties accept these findings with the exception of the tax court's finding that Wallace held disease insurance on his cattle, which both parties agree was not supported by the record.

ment and operation of the farm, having authority only to discharge the farm manager, having a farm manager who is an independent contractor rather than an employee, and having limited liability for farm losses.

H.R.Conf.Rep. No. 1515, 94th Cong., 2d Sess. 414, *reprinted in* 1976 U.S.C.C.A.N. 2897, 4118, 4125. The language in the earlier House Committee Report set out the factors in language nearly identical to that of the Conference Report:

> The determination whether a person actively participates in the operation or management of a farm depends upon the facts and circumstances. Factors which tend to indicate active participation include participation in the day-to-day decisions involving the operation or management of the farm, actually working on the farm, living on the farm, and engaging in the hiring and discharging of employees as compared to only the farm manager. Factors which tend to indicate a passive person similar to a limited partner include lack of control of the management and operations of the farm, having authority only to discharge the farm manager, having a farm manager who is an independent contractor rather than an employee, not owning the farm land in fee, and having limited liability for farm losses.

H.Rep. No. 658 (1976) at 47 n. 18, *reprinted in* 1976 U.S.S.C.A.N. 2897, 2941 n. 18; *see also* S.Rep. No. 938 at 59 n. 12, *reprinted in* U.S.S.C.A.N. 2897, 3439, 3495 n. 12 (applying identical language to "active management" provision in Senate version of section 464).

The Conference Report and the Committee Report differ in that the Conference Report deleted the provisions that (1) decisions involving the operation or management of the farm must be "day-to-day" to indicate active participation and (2) not owning the farm land in fee indicates lack of active participation. In addition, the Conference Report considered the second set of factors indicative of "a lack of active participation," while the Committee Report considered these factors indicative of "a

passive person similar to a limited partner." We adopt the factors as listed in the Conference Report as the guide to the determination of active participation. "Indications of congressional intent in a conference committee report deserve great deference by courts because 'the conference report represents the final statement of terms agreed to by both houses, [and] next to the statute itself it is the most persuasive evidence of congressional intent.' " *RJR Nabisco, Inc. v. United States,* 955 F.2d 1457, 1462 (11th Cir.1992) (quoting *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981)).

The tax court determined that feeding cattle—not buying and selling cattle—was the farming enterprise in which Wallace was engaged. Wallace, like the majority of owners, fed his cattle at commercial feedlots that were independent contractors. Like nearly all customers of commercial feedlots, Wallace had no say over the feedlot's operations or the care of his cattle. Haynes, Wallace's advisor, would select the feedlot, telephone the feedlot manager as often as three or four times a week, and report to Wallace roughly once a week. Wallace personally would speak to the feedlot manager two or three times during a given three-to-five-month feeding cycle. From 1980 to 1985, Wallace visited feedlots between two and six times. Haynes located the cattle to buy, which neither he nor Wallace ever saw firsthand. The feedlot marketed the cattle, and Haynes advised Wallace on buy and sell decisions. On at least one occasion, Wallace rejected Haynes's recommendation on when to sell and correctly anticipated a rise in market price. On another occasion, Wallace took the unusual step of moving his cattle from one feedlot to another when he was dissatisfied with the feedlot's management. Other than that, the tax court found that "Dr. Wallace made the final decision as to the cattle he would purchase; when to purchase; what feedlot to use; whether to prepurchase feed; whether to 'hedge'; what lending institution to use, if any; and when, and at what price, to sell the fattened cattle." *Wallace,* 95 T.C. at 548.

The tax court characterized these decisions as the type "an investor would make." *Id.*

The court applied the factors listed in the Conference Report and determined that Wallace satisfied none of the factors indicative of active participation and all of the factors indicative of a lack of active participation. The court found that Wallace (1) did not participate in the decisions involving the operation or management of the feedlot; (2) did not actually work on the feedlot; (3) did not live on the feedlot; and (4) did not engage in the hiring and discharging of employees (and could not even hire or fire the feedlot manager). The court also found that Wallace (1) lacked control of the management and operations of the feedlot; (2) had authority only to discontinue doing business with the feedlot itself; (3) had a relationship with the feedlot whereby the feedlot was an independent contractor; and (4) had limited liability for cattle-feeding losses.[10] Therefore, the tax court ruled that Wallace did not actively participate in the farming enterprise and was a limited entrepreneur not entitled to take advantage of the special farm tax rules. We agree with the tax court's application of these factors to the facts of this case.

### A. The Meaning of "Farming" in Section 464

Appellants claim that the tax court should have held that the definition of farming included Wallace's off-the-farm investment activity and should not have been limited to what occurred at the feedlot. We agree with the tax court that, under the contemplation of section 464, the enterprise by which to measure Wallace's participation is feeding cattle. Explaining its ruling, the tax court first noted that Mrs. Wallace testified that her husband had been in the "cattle feeding business." The court next observed that a promotional videotape entitled "The Final Touch" received by the Wallaces before they began this venture presented itself as a description of the "cattle feeding business." Finally, the

tax court reasoned that buying and selling cattle was investing, not farming, stating, "Had Dr. Wallace merely bought cattle and resold them without any other activity with respect to the cattle, he would not have been in a farming business." *Wallace*, 95 T.C. at 547–48.

Appellants argue that Congress cannot have intended to provide a definition of farming that ignored the fact that modern farming is concerned with business and investment decisions and not only hands-on agriculture. Congress, however, did not define farming for the ages; it defined farming solely "[f]or purposes of this section," the function of which was to determine who is entitled to take advantage of the special farm tax rules.

Section 464(e)(1) provides that:

the term "farming" means the cultivation of land or the raising or harvesting of any agricultural or horticultural commodity including the raising, shearing, feeding, caring for, training, and management of animals.

Appellants contend that the word "including" in the statute indicates that the definition of farming is not limited to the words listed above, and that such off-the-farm activities as buying and selling cattle and choosing lenders therefore should be included in the definition. We agree that the word "including" makes the list of activities nonexclusive. Nevertheless, looking first at the plain meaning of the statute, *see RJR Nabisco, Inc.*, 955 F.2d at 1460, one sees that all the listed activities have one thing in common: they relate to the handling or care of animals or crops. Moreover, the word "including" *follows* the phrase, " 'farming' means the cultivation of land or the raising or harvesting of any agricultural or horticultural commodity." Farming, therefore, consists of cultivation, raising, or harvesting, which includes, but is not limited to, "the raising, shearing, feeding, caring for, training, and management of animals." Other, unlisted farming activities may be included in the definition of farming *so long as* they involve cultiva-

---

**10.** Appellants argue that the tax court misapplied this final factor, regardless of how the court defined farming. The limited liability factor is discussed separately, *infra* II.D.

tion, raising, or harvesting. For example, although breeding cattle is not explicitly listed in the statute, it could be included in the definition. Making investment decisions, however, does not fall under the heading of cultivation, raising, or harvesting. Appellants argue that when a farmer goes to the bank to take out a loan, that activity is part of farming. This is undoubtedly true, but it is not the type of activity that distinguishes the farmer from the nonfarmer for the purposes of section 464.[11]

A review of the factors for determining active participation further supports our interpretation of the statute's definition of farming. The factors refer explicitly to "participation in the decisions involving the operation or management of the *farm*, actually working on the *farm*," and "living on the *farm*." (Emphasis added.) Congress intended farming to be defined here as an activity that takes place on a farm, not in a bank.[12] The language of the statute, combined with the legislative history, conclusively demonstrates that the tax court correctly chose feeding cattle as the enterprise by which to measure Wallace's participation, and thus properly found that Wallace was a limited entrepreneur.

### B. *The Purpose of Section 464*

█ With Congress's intent so clearly expressed, we do not need to investigate Congress's remedial purpose in enacting the statute. Nevertheless, an examination of the goals expressed in the legislative history indicates that excluding Wallace from the benefits of the special farm tax rules is consistent with Congress's purpose.

The Senate Report, under the heading "Reasons for change," stated, in part:

> The time value of deferring taxes on nonfarm income remains a strong attraction for outside investors to invest in farming and to use as much borrowed money as possible to create farm "tax losses." ... These special farm tax rules have been utilized not only by taxpayers who are actively engaged in farming enterprises with the intention of making a profit, but also by passive investors whose motivation, in large part, consists of a desire to use these farming rules to shelter income from other sources.... The committee believes that the special farm tax rules should be continued for most farmers who are actively engaged in farm operations, but that such special farm tax rules should be severely curtailed for farming syndicates in which a substantial portion of the interest is held by taxpayers who are motivated, in very large part, by a desire to shelter other income, rather than by a desire to make a profit in the particular farming operation.
>
> The committee believes that reducing tax incentives for high-bracket taxpayers who invest in syndicated farming operations *will improve the competitive position of full-time farmers who must look to the income generated from farm operations for all or most of the return*

---

**11.** According to the Senate Report, *"[f]or purposes of these farming syndicate rules,* the term 'farming' is *defined broadly* to mean cultivation of land or the raising or harvesting of any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of animals." S.Rep. No. 938, 94th Cong., 2d Sess. 60–61 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3496–97 (emphasis added). Farming is defined broadly to include a wide variety of types of cultivation or harvesting that would not commonly be thought of as activities that occur on a farm. The broad definition is not meant to include activities unrelated to cultivation or harvesting that occur in connection with the business of farming. The Report continues, "Thus, for example, a syndi-

cate engaged in the raising of fish, poultry, bees, dogs, flowers, vegetables, etc., as well as livestock is engaged in farming and, thus, is a farming syndicate." *Id.*

**12.** Contrary to appellants' assertions, a taxpayer need not live or work on the farm to be an active participant. One of the factors tending to indicate active participation is "hiring and discharging employees." An owner who hires employees to work on the farm and who participates in the decisions involving the operation or management of the farm could qualify as an active participant even if he or she does not work or live on the farm.

*on their investment in farm operations.*

S.Rep. No. 938, 94th Cong., 2d Sess. 53–58 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3439, 3488–94 (emphasis added).

Similarly, according to the House Report: tax incentives under present law do not benefit those for whom they were principally intended. Since such syndicates are motivated primarily by tax consequences rather than by a desire to conduct farming activities in the most economically profitable ways, your committee feels that it is appropriate [sic] to continue to extend to them all of the farm tax incentives of present law. *Your committee believes that reducing tax incentives for high-bracket taxpayers with nonfarm income will improve the competitive position of full-time farmers who must look to the income generated from farm operations for all or most of the return on their investment in farm operations.*

H.Rep. No. 658, 94th Cong., 1st Sess. 44 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 2938 (emphasis added).

Thus, Congress, in enacting section 464, intended to achieve at least two goals: (1) to increase tax revenue and (2) to improve the competitive position of full-time farmers over high-bracket taxpayers, accomplishing both by discouraging tax shelters used by wealthy investors more interested in tax consequences than in profits. One goal is related to increasing funds in the Treasury; the other goal is related to farm policy.

Appellants argue that Wallace engaged in cattle feeding for a profit and did not have limited liability, and therefore should not be considered a farming syndicate. Whether Wallace intended to make a profit is not the key question under section 464. Even a taxpayer who "in large part" is interested in tax consequences but who also has a profit motive may be considered

a limited entrepreneur.[13] The key question is whether Wallace qualified as an active participant in the management of a farming enterprise. Taxpayers in *nonfarm* businesses with a profit motive do not receive the benefits of these rules. Further, even if the goal of discouraging tax shelters would not justify considering Wallace a limited entrepreneur, the goal of improving the competitive position of full-time farmers indisputably would justify such treatment. In another case interpreting section 464, a district court determined that "the legislative history reveals that in enacting Section 464 ... Congress was concerned that high-bracket taxpayers who were not full-time farmers were using tax benefits available to farmers to shelter income." *Talcott v. United States*, No. C–87–6117–EFL, 1990 U.S.Dist. LEXIS 7821, at *11 (N.D.Cal. Apr. 12, 1990).

### C. *Commercial Feedlot Customers Who Are Not Limited Entrepreneurs*

■ In support of their next contention, appellants point out that the great majority of beef comes from cattle fed at commercial feedlots and that the great majority of cattle owners who use these feedlots do not own the feedlots and have no say over their management. Therefore, appellants contend, affirming the tax court's ruling would "render virtually every cattle owner in the United States who utilizes a commercial feedlot a limited entrepreneur." The most charitable thing that can be said about this assertion is that it is a gross misinterpretation of the statute. Inexplicably, appellants' opening brief ignores the exceptions listed in section 464(c)(2), which preserve the benefits of the special farm tax rules for taxpayers who are involved in farming in other ways, even if the nature of their participation in a particular enterprise would otherwise cause them to be considered limited entrepreneurs. Under

---

**13.** According to a committee print, prepared for the Committee on Finance, that explained the workings of the tax shelters that were the target of section 464, "[i]t should be noted, however, that until recent economic conditions, many [cattle-feeding] syndications were structured on the assumption that three of every four breed-

ing cycles *would be profitable.*" Staff of Joint Comm. on Internal Revenue Taxation, 94th Cong., 2d Sess., Tax Shelter Investments 45 n. 16 (Comm. Print 1976) (emphasis added). Congress was thus aware that the tax shelters it was seeking to eliminate often turned a profit.

subsection (c)(2), such taxpayers can use commercial feedlots and still enjoy the special farm tax rules. This subsection of the statute reads in part:

> For purposes of paragraph (1)(B) [concerning limited entrepreneurs], the following shall be treated as an interest which is not held by a limited partner or a limited entrepreneur:
>
> (A) in the case of any individual who has actively participated (for a period of not less than 5 years) in the management of any trade or business of farming, any interest in a partnership or other enterprise which is attributable to such active participation,
>
> (B) in the case of any individual whose principal residence is on a farm, any partnership or other enterprise engaged in the trade or business of farming such farm,
>
> (C) in the case of any individual who is actively participating in the management of any trade or business of farming or who is an individual who is described in subparagraph (A) or (B), *any participation in the further processing of livestock* which was raised in such trade or business (or in the trade or business referred to in subparagraph (A) or (B)),
>
> (D) in the case of an individual whose *principal business activity* involves active participation in the management of a trade or business of farming, *any* interest in *any* other trade or business of farming....

(Emphasis added.) Cow-calf producers who retain ownership of their cattle after sending them to commercial feedlots would be excepted from limited entrepreneur status under subsection (c)(2)(C) because their use of the feedlots would count as "participation in the further processing of livestock." Subsection (c)(2)(D) is even broader, excepting taxpayers who are full-time farmers with respect to one farming activity from limited entrepreneur status with respect to "any interest in any other trade or business of farming." The IRS is per-suasive when it concludes, "Under the Tax Court's decision, only an outside investor, such as Dr. Wallace, who does not actively participate in the management of the farming enterprise is prohibited from claiming such a deduction. That was precisely Congress's intent." [14]

The exceptions listed in subsection (c)(2) ensure that real farmers who use commercial feedlots still receive the tax benefits. This is consistent with Congress's focus on "reducing tax incentives for high-bracket taxpayers with *nonfarm* income." H.Rep. No. 658, 94th Cong., 1st Sess. 44 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 2938 (emphasis added).

### D. *Limited Liability*
#### 1. *Significance of Limited Liability Factor Standing Alone*

Appellants next urge that the tax court erred in determining that Wallace satisfied the limited liability factor, one of the factors that tends to indicate lack of active participation. We note first that even if the district court had erred, and Wallace's liability was not limited, we still would affirm the court's determination that Wallace did not actively participate in his farming enterprise. Limited liability is only one of eight factors listed in the legislative history for determining active participation. The legislative history does not indicate that lack of limited liability alone should outweigh the other seven factors. Moreover, limited liability is listed only as a factor tending to indicate lack of active participation. *Lack* of limited liability is not listed as a factor tending to indicate active participation. Hence, even if Wallace did not have limited liability, he nevertheless would have failed to satisfy any one of the four factors that affirmatively tends to indicate active participation.

As discussed above, section 464 had two purposes: (1) to discourage tax shelters and (2) improve the competitive position of full-time farmers with respect to high-

---

**14.** When taxpayers like Wallace do not receive the benefits of the farm tax rules, they are not completely discouraged from investing in cattle feeding. They are in the same position as businesspeople in nonfarm businesses: the profitability of cattle feeding has not changed for them, only the tax-deferral consequences.

**1050**

bracket taxpayers attracted to a business like cattle feeding largely for the tax advantages. Although one of the most salient features of a tax deferral scheme is the protection of the taxpayer from loss, it is not the only feature. Excluding a professional like Wallace—whose money was, *arguendo*, at risk but who played only an investor's role in farming—from the benefits of the special farm tax rules is consistent with both remedial purposes.

■ It is true that the Senate Committee Report's discussion of its version of section 464 centered almost solely on a "limited risk" factor for determining who is a farming syndicate. In the Senate Report, one category of "farming syndicate" was to be an "enterprise [other than a limited partnership] engaged in farming if there is an allocation of more than 50 percent of the losses to persons with *limited risk.*" S.Rep. No. 938, 94th Cong., 2d Sess. 58–59 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3439, 3494–95. With respect to this category, the Senate Report stated that "the fact that an investor delegates authority to an agent or hires an independent contractor will not in itself render the investor subject to the farming syndicate rules *unless there is limited risk.*" *Id.* at 60, U.S.C.C.A.N. at 3496 (emphasis added).

The Conference Report, however, noted that although "[t]he conference agreement generally follows the Senate Amendment.... the definition of 'farming syndicate' *is revised*" to replace the Senate version with the definition that actually appeared in the statute: "a partnership or any other enterprise ... engaged in the trade or business of farming if more than 35 percent of the losses during any period are allocable to limited partners or *limited entrepreneurs.* In general, a limited entrepreneur means a person who has an interest in an enterprise other than a partnership and who does not *actively participate* in the management of the enterprise." H.R.Conf.Rep. No. 1515, 94th Cong., 2d Sess. 414, *reprinted in* 1976 U.S.C.C.A.N. 2897, 4118, 4125 (emphasis

added). The Conference Report then proceeded to list the factors used to determine *active participation,* unambiguously rejecting the notion that limited liability alone should determine whether a taxpayer is a limited entrepreneur. We adopt as our guide the Conference Report's explanation of the language that actually appeared in the statute, rather than the Senate Report's explanation of language that was subsequently revised. *See RJR Nabisco, Inc.,* 955 F.2d at 1462.

We hold, therefore, that even if Wallace's liability was not limited, the weight of the other factors nevertheless leads to the conclusion that Wallace was a limited entrepreneur.

### 2. Whether the Tax Court Erred in its Analysis of the Limited Liability Factor

According to the postenactment explanation of the Tax Reform Act of 1976, known as the Blue Book:

In determining whether a person has limited liability for farm losses, *all the facts and circumstances are to be taken into account.* Generally, for purposes of this definition, a person will be considered to have limited liability for farm losses if he is protected against loss to any significant degree by nonrecourse financing, *stop-loss agreements,* insurance, *or other similar arrangements.* A person with limited liability for farm losses might include, in appropriate circumstances ... a principal who has given authority, in fact, to another party to conduct his operations (such as an investor who agrees to allow a feedlot to manage feeder cattle which he has purchased) and who utilizes nonrecourse financing, *stop-loss orders* [,] insurance, etc., to limit his risk.

General Explanation, Staff of the Joint Committee on Internal Revenue Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 59 n. 13 (Comm. Print 1976) (hereinafter "General Explanation") (emphasis added).[15]

---

**15.** We cite the General Explanation not as an expression of legislative intent, as it was prepared by committee staff after enactment of the statute, but as a valuable aid to understanding

Wallace did not use nonrecourse financing. Nor did he enter into any sort of guarantee contract whereby he would buy cattle only if the person arranging the sale of the cattle would guarantee that Wallace's losses were limited to a certain amount. Wallace's losses were limited only to the extent that he engaged in hedging on the futures market of the Chicago Mercantile Exchange. Our reading of the legislative history suggests, however, that Congress was not concerned with precisely *how* a taxpayer's losses were limited, even though nonrecourse loans and direct guarantees by promoters were the methods of limited liability that Congress had foremost in mind.

■ The tax court ruled that Wallace had limited liability because Wallace "was protected from losses to a significant degree by the use of hedging and in 1980, his cattle were 100–percent hedged. In some subsequent years Dr. Wallace's cattle were 100–percent hedged." *Wallace,* 95 T.C. at 550.[16]

Richard McDonald, executive vice president of Texas Cattle Feeders Association, a trade association headquartered in Amarillo, was called as a witness in the tax court by the taxpayers. On direct examination, McDonald testified that "[y]ou use the futures market to be able to lock in what we call a *stop loss*. In other words, maybe you won't lose more than $20 a head, or you will be able just to break even." (Emphasis added.)

Engaging in hedging on the futures market is not in and of itself indicative of limited liability or lack of active participation. For instance, the tax court record reveals that any farmer borrowing from a Production Credit Association (PCA) might be required to engage in a certain amount of hedging on the futures market. According to the record, owners who use commercial feedlots are no more likely to hedge than owners who feed their cattle on ranches. Further, as *amicus curiae* National Cattlemen's Association states, hedging only establishes a cattle owner's "selling price per pound.... The cattle may not gain the expected weight or the cattle may not achieve the contracted quality. Hedging never guarantees a profit. It is a viable tool for management of the market *price* risks associated with livestock ownership. It in no way affects the production risks...."

Nevertheless, as the General Explanation states, "[i]n determining whether a person has limited liability for farm losses, all the facts and circumstances are to be taken into account." General Explanation at 59 n. 13. Unusually excessive use of hedging would indicate a greater concern on the part of the taxpayer with limiting liability than with maximizing profit, particularly because cattle feeders normally have an opportunity to hedge only at break-even or at a loss. In 1980 and from time to time in subsequent years, as the tax court noted, Wallace was one hundred percent hedged. He always ensured that he was hedged to the extent that his projected losses could not exceed $200,000.

McDonald testified that "[t]he majority of people will only hedge a certain percentage. Again, it depends on what they think the market is going to do and what their lender is going to require of them, because if they—the more they hedge normally, that reduces their equity requirements."

the statute. We accord it no weight as binding authority on legislative intent. *See McDonald v. Commissioner,* 764 F.2d 322, 336 n. 25 (5th Cir.1985) ("The Joint Committee is a staff committee, and its 'Explanation[ ]' was issued after the fact. Hence it does not directly represent the views of the legislators or an explanation available to them when acting on the bill. The Joint Committee's views, however, are entitled to great respect."); *see also* Michael Livingston, Congress, the Courts, and the Code: Legislative History and the Interpretation of Tax Statutes, 69 Tex.L.Rev. 819, 885 (1991) (recommending that when "the Blue Book adds explanatory material, it should be as persuasive as similar material in the committee reports"). The General Explanation tracks nearly identical language in the Senate Report. *See* S.Rep. No. 938, 94th Cong., 2d Sess. 60 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3496 (concerning the "limited risk" passage of the Senate version of section 464).

16. The tax court also found, incorrectly, that Wallace was protected from loss by disease insurance.

The tax court asked McDonald how, if a farmer hedged *all* his cattle, he "could make any money or make any loss either?"

McDonald answered, "That is why most of the time you do not hedge all of them. It is very rare that anybody would hedge all of their cattle." McDonald further testified that "historically the day that you buy the cattle, *you historically can't lock in a profit on the futures market....* Well, historically the break even projected out in the future is normally greater than what that futures market is that day" (emphasis added). Therefore, when a taxpayer hedges one hundred percent of his or her cattle, and there is no indication that he or she hedged at a profit, the only conclusion one can draw is that the taxpayer was more concerned with limiting liability than making a profit. Further, the tax court and McDonald engaged in the following colloquy:

> THE COURT: And basically it isn't very easy to make something on a hedge. It is done to protect a loss mainly, isn't it?
> THE WITNESS: That is the main reason. Yes, ma'am.
> THE COURT: And usually you make—unless you make a speculative gain by closing out in the interim—
> THE WITNESS: Right. That is what we call a Texas hedge.
> THE COURT: —which is a gain on hedging—
> THE WITNESS: That is a Texas hedge.
> THE COURT: —you really do not make and you hope you don't lose on it ordinarily.
> THE WITNESS: Right. I would say probably 90 percent of the people that are using the futures market use it to protect their downside risk.

Wallace's cattle feeding advisor, Haynes, then testified that in 1980, when Wallace was one hundred percent hedged, he had managed to "sell the futures market at a point above our projected break-even, including all costs, including my compensation." The following colloquy later ensued, however:

> THE COURT: ... The cattle feeding program initiated by Dr. Wallace in 1980 was culminated in '81 with a gross profit of $13,783 and a net loss of $104,048. Now were those the cattle that you had completely hedged at what you told me was a profit?
> THE WITNESS: The—yes. The cattle that I spoke of as being hedged at a profit would have been the cattle that were sold in 1981.
> THE COURT: Well, then, would you kind of [sic] [kindly?] define to me what you looked at as a profit?
> THE WITNESS: Okay. The numbers that you read there are not familiar numbers.
> THE COURT: Oh, I didn't expect them to be.
> THE WITNESS: The profit—
> THE COURT: I don't know where the parties got these, but they have agreed to it, anyhow.
> THE WITNESS: Okay.
> THE COURT: They have agreed that Dr. Wallace had a net loss of $104,000, although he had a gross profit.

Wallace was thus one hundred percent hedged in 1980, when he sustained a loss of more than $100,000. Haynes maintained, nevertheless, that he and Wallace had projected a net profit for 1980, testifying that "[i]n our first year, I remember that we had—our gain costs were substantially higher than we had projected them. And we were—I know I was disappointed with it, and I know Gerald Wallace was disappointed with it." According to this testimony, Wallace was out to make a profit, and he took the highly unusual position of hedging one hundred percent of his cattle, presumably on the advice of his expert advisor, Haynes. Instead of receiving a gain, Wallace suffered a loss of more than one hundred thousand dollars. Yet Wallace did not terminate his association with advisor Haynes, who had so badly miscalculated whether the business would turn a profit. One would imagine that if Wallace were involved in cattle feeding largely for the profit, he would have been upset that his advisor had encouraged him to take the highly unusual step of hedging one hundred percent of his cattle at a loss.

Although Wallace's liability was not limited in the sense of being immune from all types of loss related to his cattle-feeding business, his unusually excessive use of hedging to protect against fluctuations in market price evidenced a predominant concern with protection against loss that is consistent with a greater interest in the tax benefits, rather than the profit potential, of cattle feeding. We agree, therefore, with the tax court that Wallace satisfied the limited liability factor.

## CONCLUSION

For the foregoing reasons, we conclude that the tax court was correct when it determined that Wallace was a limited entrepreneur under 26 U.S.C. § 464. We therefore AFFIRM the tax court's order finding deficiencies in appellants' tax returns for the years 1980 and 1983.