AVIS INDUSTRIAL CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Avis Indus. Corp. v. Commissioner
Docket No. 20575-93.
United States Tax Court
T.C. Memo 1995-434; 1995 Tax Ct. Memo LEXIS 436; 70 T.C.M. (CCH) 641; September 11, 1995, Filed *436 Decision will be entered under Rule 155. Patrick J. Burns and G. Scott Nebergall, for petitioner. Ronald T. Jordan, for respondent. COHEN, Judge COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 1,052,400 in petitioner's Federal income tax for 1988. The issues for decision are whether deductions claimed by petitioner Avis Industrial Corp. and subsidiaries (petitioner) for salary, bonuses, term life insurance premiums, and loan forgiveness for Leland E. Boren (Boren) and for Richard T. Doermer (Doermer) for 1988 exceed reasonable compensation for services rendered. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, the principal place of business of petitioner was Upland, Indiana. In 1988, petitioner was a holding company for 14 wholly owned subsidiaries (12 first-tier and 2 second-tier subsidiaries) located throughout *437 the United States. These subsidiaries engaged in manufacturing products primarily for the automotive, construction, and railroad industries. Boren owned 22 percent of petitioner and served as the chairman of the board and chief executive officer of petitioner. Boren's wife, LaRita Boren (Mrs. Boren), owned 28 percent of petitioner. Doermer owned the remaining 50 percent of petitioner and was vice chairman of the board. Boren graduated from high school in 1941 and went to work as a material control clerk at The Pierce Governor Co., Inc. (Pierce), a manufacturer of speed-control devices. By 1958, Boren was president of Pierce. In 1969, Boren became president and director of Avis Industrial Corp. (Old Avis), the parent corporation of Pierce. Old Avis operated three divisions (Pierce, James Steel & Tube Co. (James Steel), and Melling Forging Co. (Melling Forging)) and owned two subsidiaries (Hurd Lock and Winpower). Old Avis was wholly owned by International General Industries (IGI), itself a wholly owned subsidiary of International Bank. Beginning in 1968, Boren served as a director of IGI and as president and director of several subsidiaries of IGI and International Bank. Doermer *438 received an undergraduate degree in business administration from the University of Notre Dame in 1944 and a law degree from Cornell University in 1949. Doermer engaged in the general practice of law from 1949 until 1956, when he joined the Dime Trust and Savings Bank (Dime) in Fort Wayne, Indiana, as executive vice president and director. In 1956, the total assets of Dime were $ 11 million. Doermer was elected president and chief executive officer of Dime in 1957. The bank grew to $ 400 million in assets by the end of 1983 and then merged with another Fort Wayne bank and assumed the name Summit Bank. In 1983, Doermer became chairman of the board and chief executive officer of Summit Bank and its parent holding company, Summcorp. Boren and Doermer became associated with one another in 1958, when Boren, on behalf of Pierce, approached Dime for a loan. Although Boren's loan request was denied by Dime, Doermer was so impressed with Boren that Doermer raised the funds for Pierce privately. In 1974, Boren and Doermer began to assemble what eventually became petitioner. Boren and Doermer each acquired 40 percent of the stock of Pacific Forge, Inc. (Pacific Forge) in 1974. Thomas Logan (Logan), *439 an attorney, owned the remaining 20 percent of Pacific Forge. Between 1974 and 1988, Boren and Doermer gradually acquired ownership of three more companies with the aid of the Narragansett Capital Corp. (Narragansett), a small business investment company, via leveraged buy outs. Royal Little (R. Little) and his son, Arthur Little (A. Little), were senior executive officers of Narragansett. The three companies acquired were: Burro Crane, Inc. (Burro), in 1976; Western-Cullen-Hayes, Inc. (Western), in 1977; and U.S. Broach Corp. (Broach), in 1979. Boren and Doermer together owned 50 percent of the voting common stock of Burro, Western, and Broach. Narragansett initially owned 50 percent of the voting common stock of Burro but converted its stock ownership to "nonvoting" in order to qualify for regulated investment company status. Narragansett's 50-percent stock ownership in Western and Broach was nonvoting. Pursuant to a written shareholders' agreement executed among Boren, Doermer, and Narragansett, Narragansett had the right to convert any or all of its nonvoting common stock in Western to voting common stock at any time. R. Little and A. Little oversaw Narragansett's investments *440 in Burro, Western, and Broach. R. Little and A. Little also served on the boards of these three companies. Initially, the board members of Burro, Western, and Broach consisted of Boren, Doermer, R. Little, and A. Little. Mrs. Boren and Mary Louise Doermer (Mrs. Doermer), Doermer's wife, were elected to the boards of these three companies in February 1981 and remained on the boards through 1988. R. Little and A. Little regularly attended board meetings for each company and received financial packages disclosing the relative performance of each company on a monthly basis. While Narragansett held its interests in Burro, Western, and Broach, it performed financial and management consulting services and reviewed potential acquisitions for the companies. In return, Narragansett received management fees in the following amounts: Year
Burro
Broach
Western
1976
$ 11,000
-- -- 1977
12,000
-- -- 1978
96,000
-- -- 1979
100,000
-- -- 1980
100,000
$ 50,000
-- 1981
77,000
100,000
$ 97,000
1982
100,000
100,000
110,000
1983
135,000
113,000
100,000
1984
100,000
100,000
100,000
1985
-- 50,000
-- 1986
-- -- -- 1987
-- -- -- *441 Each year, the compensation for the management of Burro, Western, and Broach was set by the respective boards of these companies. Prior to the board meetings, R. Little and A. Little received from Boren a listing of existing compensation levels and proposed compensation levels. They evaluated the financial performance of each company prior to approving proposed compensation levels. In 1978, Burro acquired two subsidiaries through leveraged buy outs: Burro-Badger Corp. (Badger) and Insley Manufacturing Corp. (Insley). In 1979, Boren and Doermer each acquired 40 percent of the stock, and Pacific Forge acquired 20 percent of the stock of American Baler Co., Inc. (Baler). In 1981, the Borens and Doermer organized a holding company called Pacific American Corp. (PAC). They transferred all of their stockholdings to PAC as follows: 50 percent in Burro, which owned Badger and Insley; 50 percent in Western; 50 percent in Broach; 80 percent in Baler; and 80 percent in Pacific Forge. In exchange for these stock interests, Boren, Mrs. Boren, and Doermer received, respectively, 22 percent, 28 percent, and 50 percent of the stock of PAC. Narragansett continued to hold its 50-percent ownership *442 interest in Burro, Western, Broach, and Burro's subsidiaries, Insley and Badger. Burro sold Badger and Insley to PAC in 1982 for a nominal sum. Narragansett consented to the nominal sales price because the two subsidiaries had been losing money. In 1983, the Borens and Doermer organized AIC Acquisition Corp. (AIC) to purchase the assets of Old Avis from IGI. AIC organized the assets into five divisions and changed its name to Avis Industrial Corp., petitioner. In 1985, petitioner incorporated the five divisions into wholly owned subsidiaries: Pierce, Hurd Lock, James Steel, Melling Forging, and Winpower. In 1985, petitioner also acquired all of the stock of North Vernon Forge, which itself owned a subsidiary. In 1986, PAC merged with petitioner in a pooling of interests. Also in 1986, Logan's 20-percent interest in Pacific Forge was redeemed for cash. In 1985, the Borens and the Doermers purchased 100 percent of the stock of Martin J. Tobin Corp. As of January 1, 1988, they made a capital contribution of their stock to petitioner. In 1987, petitioner redeemed Narragansett's 50-percent interests in Burro, Western, and Broach for cash and acquired the Crankshaft Machine Co. By 1987, *443 petitioner wholly owned 12 subsidiaries directly and 2 subsidiaries indirectly. During 1982 to 1988, petitioner and its subsidiaries had consolidated earnings from operations as follows: ($ 000)
1981
1982
1983
1984
1985
1986
Earnings
before
interest
and tax
$ 13,956
$ 8,686
$ 6,322
$ 9,254
$ 7,255
$ 9,037
(EBIT)
Interest
expense
1,996
1,766
1,831
1,977
2,360
2,613
Earnings
before
tax
11,960
6,920
4,491
7,277
4,895
6,424
Income
tax
6,195
2,810
2,203
3,211
2,315
2,434
Net
earnings
5,765
4,110
2,288
4,066
2,580
3,449
($ 000)
1987
1988
Earnings
before
interest
and tax
$ 9,413
$ 10,864
(EBIT)
Interest
expense
2,174
2,790
Earnings
before
tax
7,329
8,074
Income
tax
2,411
2,105
Net
earnings
4,405
5,724
In accordance with generally accepted accounting principles, the earnings for 1986, 1987, and 1988 do not include petitioner's deductions in those years for a self-insurance reserve petitioner established for estimated future product liability claims. During 1981 to 1988, petitioner's consolidated return on equity (ROE), return on total assets (ROA), operating margin, and debt ratio *444 were as follows: ROE (Net Income/Total Equity)
1981
1982
1983
1984
1985
1986
1987
1988
16.28%
10.66%
8.89%
15.23%
9.28%
9.99%
13.28%
17.12%
ROA (Earnings Before Tax/Total Assets)
1981
1982
1983
1984
1985
1986
1987
1988
16.5%
10.4%
6.71%
9.62%
5.27%
5.95%
6.62%
7.20%
Operating Margin (EBIT/Net Sales)
1981
1982
1983
1984
1985
1986
1987
1988
10.5%
7.67%
5.63%
7.02%
4.81%
4.75%
4.72%
5.26%
Debt Ratio (Total Liabilities/Total Assets)
1981
1982
1983
1984
1985
1986
1987
1988
15.08%
10.67%
23.27%
22.50%
28.46%
25.54%
25.69%
28.36%
Petitioner also paid dividends to its shareholders for 1982 to 1988 as follows: ($ 000)
1982
1983
1984
1985
1986
1987
1988
Common
$ 1,450
$ 4,375
$ 4,000
$ 3,500
$ 4,000
--
$ 1,000
Preferred
-- 326
455
455
455
$ 455
455
Boren was involved in many aspects of the operations of the subsidiaries but typically focused upon those companies that were struggling to meet the desired level of profitability. As chairman of the board, Boren was responsible for developing the basic objectives, policies, and operating plans of petitioner, for *445 the bottom-line results of petitioner, for any acquisitions, for trainee and training programs, and for analyzing operating results of the corporation and its subsidiaries. Because the subsidiaries were situated in a variety of locations, Boren's travel schedule was extensive. He frequently worked 12- to 14-hour days, 6 days a week. In addition to his employment with petitioner, Boren served as a director of a number of banks, including Summit Bank, and other manufacturing companies and was a member of several board committees. Boren also operated a cattle farm and was involved in a number of civic and charitable activities. The total compensation accrued for Boren from petitioner during 1981 to 1988 was as follows: ($ 000)
1981
1982
1983
1984
1985
1986
Salary
$ 551
$ 1,089
$ 612
$ 880
$ 760
$ 793
Bonus
--
145
105
260
400
530
Forgiveness
of loans
--
--
--
--
--
--
Total
$ 551
$ 1,234
$ 717
$ 1,140
$ 1,160
$ 1,323
($ 000)
1987
1988
Salary
$ 926
$ 884
Bonus
725
100
Forgiveness
of loans
--
1,251
Total
$ 1,651
$ 2,235
The 1982 salary to Boren included $ 150,000 of "vacation pay" that was accrued upon Boren's *446 "retirement" from Old Avis. This amount was included on a Form 1099. Boren was assisted in his work by Gene Hainen (Hainen). Hainen served as the president and chief operating officer of petitioner from 1983 to 1990 and was responsible for the profit and loss of several subsidiaries and for acquisition analysis and recommendations. He also served as a director of several of petitioner's subsidiaries and reported directly to Boren. Doermer, as vice chairman of petitioner, was involved in the financial reviewing and monitoring of petitioner. Doermer's duties included administrative and managerial tasks, controlling costs, developing and maintaining banking relations, assisting the president, reviewing monthly subsidiary and corporate financial statements, and maintaining customer contacts. He took an active role in petitioner's acquisition process by evaluating and reviewing all of petitioner's potential acquisitions and making recommendations. Although Doermer lived 60 miles away from the home offices of petitioner, he spoke with Boren on a daily basis and received several financial documents from petitioner each week to review. Between 1956 and 1993, Doermer also worked full time *447 in the banking industry. In 1988, Doermer received a salary in the amount of $ 279,203.59 for services performed for Summit Bank and Summcorp. He also earned director's fees of $ 25,200, which were deferred under agreement with Summcorp, in connection with his position as chairman of the board of Summit Bank and Summcorp. In addition, Doermer served on the boards of several banks in Indiana and on the boards of a number of nonbanking companies as well. He was also engaged in numerous civic and social activities. The total compensation accrued for Doermer from petitioner from 1981 to 1988 was as follows: ($ 000)
1981
1982
1983
1984
1985
1986
Salary
$ 299
$ 577
$ 408
$ 372
$ 313
$ 297
Bonus
--
40
80
285
350
425
Term life
premium
--
--
--
--
--
--
Loans
forgiven
--
--
--
--
--
--
Total
$ 299
$ 617
$ 488
$ 657
$ 663
$ 722
1987
1988
Salary
$ 319
$ 294
Bonus
550
--
Term life
premium
--
5
Loans
forgiven
--
105
Total
$ 869
$ 404
In 1988 and prior years, each operating corporation owned by Boren and Doermer (directly or through PAC or through petitioner) and, before 1983, each division of Old Avis employed a *448 general manager. Each general manager was responsible for the day-to-day operations of the subsidiaries to which he was assigned and for which he was accountable. The general managers were evaluated upon the success or failure of the subsidiary to achieve specific management goals. Performance budgets for the subsidiaries were set annually, were reviewed and adjusted monthly, and were monitored weekly by Boren and others at petitioner's headquarters. In 1988, any general manager's proposed capital expenditure over $ 500 had to be approved by Boren personally. In 1976, Boren hired Ronald L. McDaniel (McDaniel), an accountant, to manage the Burro operation. Later, in 1977, Boren assigned McDaniel to manage the Western operation as well. McDaniel was initially a vice president and general manager of each corporation and of Badger. In 1979, McDaniel was named president and general manager. When Badger was sold by Burro to PAC in 1982, McDaniel severed his employment at Badger, but he remained president and general manager of Burro and Western until 1990, when he purchased the stock of Western from petitioner and left petitioner's employ. In 1977, McDaniel and Western entered into a deferred *449 compensation agreement. Pursuant to the terms of the agreement, in the event that McDaniel voluntarily terminated his employment, he was required to remain on a consulting basis for 1 year and was prohibited from competing with Western for that same period. The following amounts were credited to McDaniel under the terms of the deferred compensation agreement with Western and paid to him as compensation from Burro and Western: ($ 000)
1981
1982
1983
1984
1985
1986
Salary
$ 225
$ 225
$ 225
$ 225
$ 225
$ 225
Bonus
400
210
100
200
225
225
Deferred
compen.
145
120
127
135
136
94
Forgiven
debt
--
--
--
--
--
--
Total
compen.
$ 770
$ 555
$ 452
$ 560
$ 586
$ 544
1987
1988
Salary
$ 225
$ 225
Bonus
225
225
Deferred
compen.
123
174
Forgiven
debt
--
636
Total
compen.
$ 573
$ 1,260
As a condition to receiving bank financing, petitioner and several of its subsidiaries purchased "key man" life insurance policies on the lives of Boren, Doermer, and McDaniel. Petitioner purchased insurance on Boren in 1974, 1979, and 1983 and on Doermer in 1983; Western purchased insurance on Boren and McDaniel in 1977; Burro purchased *450 insurance on Boren and McDaniel in 1978; and Badger purchased insurance on Boren in 1983. All of the policies, except the policy purchased in 1983 on Doermer, were required under lending agreements. On June 16, 1980, Boren sent a memorandum to McDaniel confirming a conversation the two of them had had. In this memorandum, Boren wrote regarding the life insurance policies: "As you know, I have explained that our retirement policies at the different plants are very small and that this is one way to have a retirement plan without including all people." In a letter to attorney Logan dated December 6, 1980, Boren stated: If you recall at the last Board of Directors meeting of all the Narragansett/Boren/Doermer companies, a motion was made and unanimously agreed upon that the insurance policies held on Ron McDaniel and Leland Boren's lives are to be the property of the individuals after any bank requirements for these insurance policies are fulfilled.
Logan, however, prepared minutes that reflected the following resolution: RESOLVED, That in the event that the Corporation has continued in effect life insurance policies on the lives of Leland E. Boren and Ronald L. McDaniel at *451 the time of their death, and in the event that the proceeds with respect to said policies are not required for the satisfaction of any loans of the Corporation, then the net proceeds of the policies of insurance shall be payable to the beneficiaries designated by such employees.
Beginning in 1983, as the cash surrender value of the policies increased, the respective companies borrowed on the policies and loaned the proceeds on mirror terms to Boren, Doermer, and McDaniel. The balances at each yearend of loans outstanding and owed to each corporation by Boren, Doermer, and McDaniel as a result of the conduit cash surrender value loans were as follows: Year
Boren
Doermer
McDaniel
1983
$ 300,164
-- $ 233,838
1984
395,506
-- 337,224
1985
486,858
-- 400,447
1986
486,858
-- 400,447
1987
1,106,090
$ 105,000
485,355
1988
1,251,387
105,000
636,067
On March 25, 1987, the board members of petitioner signed a unanimous consent authorizing the officers of the corporation to seek advice from and to consult with independent accountants and legal counsel regarding the possible adoption of a nonqualified deferred compensation plan for Boren and Doermer. *452 Also in 1987, the board members of the lending companies resolved to transfer the policies, stripped of cash value, to the insured officers because the policies were no longer needed for collateral purposes. In a special board meeting held in October 1987, the members of the board of petitioner resolved that, based on the projected profit for the year ended December 31, 1987, petitioner was authorized to distribute bonuses among its officers and employees for 1987, payable in 1988, not to exceed, in the aggregate, the sum of $ 1,150,000. In 1988, the total amount of the loans made to Boren, Doermer, and McDaniel in connection with the cash surrender value of the life insurance policies amounted to $ 1,251,387, $ 105,000, and $ 636,066, respectively. Pursuant to resolutions by the board of directors of petitioner and the lending subsidiaries, the loans were forgiven in 1988. No discussion of a deferred compensation plan is contained in the board minutes of Burro, Western, or Badger that authorized the forgiveness of the cash value loans. The principals were advised and believed that 1988 was a good year to take compensation because of reduced effective tax rates that year in comparison *453 to earlier years. All state that the loans were forgiven effective December 31, 1988, and that the forgiveness of debt was to be treated as taxable income to the principals. Petitioner authorized forgiveness of loans relating to policies on the lives of Boren and Doermer in a board action taken on December 2, 1988. In connection with the forgiveness of loans to Boren and Doermer, the board minutes stated: That in lieu of a bonus to Leland Boren, the notes between him and Avis totaling $ 298,578.71 relating to loans against life insurance policies previously owned by the Corporation, shall be forgiven effective December 31, 1988. Likewise, in lieu of a bonus to Richard Doermer, the loan between him and Avis in the amount of $ 105,000 shall be forgiven effective December 31, 1988.
In a memorandum from Boren to petitioner's board of directors dated March 1, 1989, Boren wrote, regarding the discharge of debt income he had received, that his salary from petitioner for 1989 should be eliminated until the debt was satisfied. Doermer replied to Boren's memorandum with a letter in which Doermer advised Boren that it was "unthinkable" of Boren to eliminate his salary at petitioner *454 until the debt was removed. Doermer wrote: "This whole situation was based upon a need at the time, and I can find no basis in reason for you not to continue your salary." Petitioner is on the accrual method of accounting for tax purposes. Nevertheless, petitioner's 1988 deduction for compensation of Boren and Doermer was in the amounts actually paid to them during 1988 as reported on 1988 Forms W-2. The compensation paid to Boren and Doermer in 1988 consisted of the following elements: Boren
Doermer
Salary for 1988
$ 855,216
$ 293,710
Bonus for 1988
100,000
--
Bonus for 1987
725,000
550,000
Term life premium
--
4,773
Loans forgiven
1,251,387
105,000
Total
$ 2,931,603
$ 953,483
Of these amounts, respondent allowed and disallowed the following amounts: Employee
Claimed
Allowed
Disallowed
Boren
$ 2,931,603
$ 579,158
$ 2,352,455
Doermer
953,483
217,183
736,300
OPINION Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". Section 1.162-9, Income Tax Regs., provides that bonuses paid to employees are deductible "when such payments are made in good faith *455 and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered." Whether an expense that is claimed pursuant to section 162(a)(1) is reasonable compensation for services rendered is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). The burden is on petitioner to show that it is entitled to a compensation deduction larger than that allowed by respondent. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267. Under certain circumstances, prior services may be compensated in a later year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); American Foundry v. Commissioner, 59 T.C. 231, 239 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976). *456 However, in such instances, the taxpayer must establish that there was not sufficient compensation in the prior periods and that, in fact, the current year's compensation was to compensate for that underpayment. Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992). The cases contain a lengthy list of factors that are relevant in the determination of reasonableness, including: The employee's qualifications; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; a comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and the amount of compensation paid to the particular employee in previous years. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115 (6th Cir. 1949), affg. a Memorandum Opinion of this Court; see also Commercial Iron Works v. Commissioner, 166 F.2d 221, 224 (5th Cir. 1948). *457 No single factor is determinative. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). When the case involves a closely held corporation with the controlling shareholders setting their own level of compensation as employees, the reasonableness of the compensation is subject to close scrutiny. Owensby & Kritikos, Inc. v. Commissioner, supra.
In this case, the parties dispute the reasonableness of the compensation paid by petitioner to Boren and Doermer in 1988 that is attributable to services rendered during the 1988 taxable year. Before addressing the reasonableness of the compensation deduction taken by petitioner in 1988, however, we must first decide what portion, if any, of the total paid in 1988 was intended to be deductible as compensation for services performed in prior years. Forgiveness of Loans
Petitioner argues that, from the inception of the key man life insurance policies on the lives of Boren, Doermer, and McDaniel, the purchasing companies intended that if, and when, the policies were no longer needed to satisfy the lenders' requirements, all of the policies would be transferred *458 to the respective officers insured thereunder as deferred compensation. Therefore, petitioner contends that the forgiveness of these loans in 1988 should be viewed as earned by the three insured individuals over the years prior to and including 1988 as and to the extent the cash surrender value of the related policies grew. Accordingly, petitioner maintains that the $ 1,251,383 included as Boren's compensation in 1988 is actually attributable to services rendered over the 15-year period from 1974 to 1988 and, similarly, that the $ 105,000 reflected in Doermer's 1988 compensation is attributable to services rendered over the 5-year period from 1983 to 1988. Respondent argues that no contemporaneous evidence exists supporting petitioner's theory, and the written record contradicts the testimony presented by petitioner. We agree with respondent that petitioner has failed to demonstrate that the buildup in the cash values of the life insurance policies was intended as a form of deferred compensation for Boren or for Doermer. Contradiction of the testimony of petitioner's witnesses need not come from other witnesses but may arise from other evidence. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606-607 (9th Cir. 1968), *459 affg. T.C. Memo. 1967-7 (failure to earmark funds as being in part for prior services supports contention that claim is an afterthought); Greer v. Commissioner, 17 T.C. 965, 970 (1951). Here, the documentary evidence presented is not consistent with the testimony of petitioner's witnesses. There is no evidence that the buildup of the cash surrender values of the policies was contemporaneously allocated as a form of deferred compensation for either Boren or Doermer during the years the policies were held by petitioner. The only documentary evidence supporting petitioner's assertion are the two memoranda Boren wrote to McDaniel and to Logan in 1980. Minutes prepared by Logan differ in describing the resolution actually adopted. Boren testified that Logan had tax reasons for not following Boren's phrasing of corporate action. Logan did not testify. Petitioner nonetheless contends that the memoranda confirm that the buildup in the cash surrender value of the policies was intended to be deferred compensation and that the 1988 loan forgiveness simply implemented what had been agreed upon many years earlier. Petitioner, however, *460 failed to present any documentary evidence during the 8-year period from 1980 to 1988 corroborating its claim that the annual buildup of cash value was taken into consideration by petitioner to assure that the amounts were consistent with the value of the services provided by Boren and Doermer in those years. There is no evidence that the individuals were undercompensated in those years without consideration of the insurance policies. Moreover, the board minutes authorizing the forgiveness of the loans to Boren and Doermer do not mention the existence of a deferred compensation plan. Rather, the minutes of Western, Burro, and Broach simply state that the loans were forgiven effective December 31, 1988, and that the forgiveness of debt would be treated as taxable income to Boren and McDaniel. Boren testified: "In 1988 I believe the tax rate was lower than the previous years; and we were told that if we wanted to take that deferred compensation out at that time, to roll it over or convert it to something else, that would be the time to do it in that year." In conflict with petitioner's present assertion that the forgiveness of the loans was a payout of a deferred compensation plan are *461 the board minutes of petitioner dated December 2, 1988, in which the board members resolved to forgive the outstanding loans to Boren and Doermer in lieu of a bonus for that year. It is also difficult to reconcile the testimony of the witnesses with the unanimous consent document of petitioner's board members dated March 25, 1987, authorizing the officers to seek consultation regarding the possible adoption of a nonqualified deferred compensation plan for Boren and Doermer. Such documentation strongly suggests that no deferred compensation program was in existence as of that date. In addition, Boren's memorandum dated March 1, 1989, to petitioner's board of directors, in which he states, in connection with the cancellation of his loans to petitioner, that he intended to eliminate his salary for 1989 until his debt to petitioner was repaid contradicts his testimony at trial that the discharge income was simply a payout of a longstanding deferred compensation plan. In sum, we are unable to reconcile the contemporaneous documentary evidence in this case with the testimony of petitioner's witnesses at trial. Petitioner has thus failed to satisfy its burden of establishing that the forgiveness *462 of the loans to Boren and Doermer in 1988 was part of a longstanding deferred compensation plan. The forgiveness of the loans will be considered additional compensation paid to Boren and Doermer in 1988. Petitioner has not argued that the debt discharge income to Boren and Doermer is attributable to services performed by these officers in 1988, with the exception of the $ 145,297 in cash value loans taken out by Boren in 1988 and also discharged in that year. Petitioner has failed to demonstrate either that the forgiveness of the loans was intended to compensate Boren and Doermer for services performed in years prior to 1988 or that the officers did not receive sufficient compensation in prior years. Thus, petitioner is not entitled to deduct in 1988 the forgiveness of loans to Boren and Doermer in the amounts of $ 1,106,090 and $ 105,000, respectively. 1987 Bonuses
The parties agree that the bonuses for 1987 that were paid in 1988 were paid as compensation for services rendered by Boren and Doermer during 1987. Respondent, however, contends that petitioner is not entitled to deduct these amounts in 1988 because petitioner failed to establish that Boren and Doermer were otherwise *463 undercompensated in 1987. See Pacific Grains, Inc. v. Commissioner, supra; Estate of Wallace v. Commissioner, 95 T.C. 525 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992). Petitioner argues that it need only demonstrate that the compensation paid to Boren and Doermer with respect to services rendered in 1987, including the bonuses paid in 1988, was reasonable. Petitioner argues that it need not establish that Boren and Doermer were undercompensated in 1987 because its situation is distinguishable from the cases cited by respondent. Here, petitioner argues, it did not decide in 1988 to pay Boren and Doermer additional income in the form of cash bonuses in order to compensate them for services performed during 1987. Rather, the board authorized the bonuses, in the aggregate, in 1987 for services performed by the officers in 1987, but simply paid these bonuses and deducted them in its tax return in 1988. Petitioner maintains that, because the decision to compensate Boren and Doermer for services performed in 1987 was not made in 1988, the year in which the deduction was sought, *464 the correct test for the deduction is not whether the officers were undercompensated in 1987. Rather, petitioner argues that we need only determine whether the compensation relating to 1987, including bonuses paid in 1988, was reasonable under all of the facts and circumstances. Petitioner's argument about the reasonableness of total compensation to Boren and Doermer for 1987 is as follows: "Compared with the 1982 arm's-length base year * * * Boren's and Doermer's 1987 compensation was significantly higher than in 1982, but not unreasonably so." Petitioner's extrapolation is based on the assertion that 1982 compensation was arm's length and thus became a "base year". As discussed in detail below, we are not persuaded that petitioner's base year analysis is valid. Thus, petitioner has not proven that total compensation paid for 1987 was reasonable and has not even claimed that Boren and Doermer were undercompensated in that year. The bonuses paid to Boren and Doermer in the amounts of $ 725,000 and $ 550,000, respectively, cannot be deducted in 1988. Reasonable Compensation for 1988
After reducing the total compensation amounts paid to Boren and Doermer in 1988 by the debt *465 discharge income for loans from years prior to 1988 and by the 1987 bonuses, the respective amounts of $ 1,100,513 and $ 298,483 remain as the amounts paid for services performed in 1988. Respondent contends that there is no justification for 1988 compensation levels for Boren and Doermer in excess of $ 579,158 and $ 217,183, respectively. Performance
The past and present financial condition of the company is relevant to deciding whether compensation was reasonable. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1157-1158. The financial performance of petitioner is disputed by the parties. Both petitioner and respondent relied upon experts to examine the financial condition of petitioner over time and relative to comparable companies. Petitioner introduced the expert report of Michael S. Kesner (Kesner); respondent introduced the expert report of Scott D. Hakala (Hakala). We are not bound by the opinion of any expert, and we may accept an expert's opinion or reject testimony that is contrary to our judgment. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). *466 In this case, we apply our own judgment and the testimony of the fact witnesses to the statistical analyses presented by the experts. We give less weight to the subjective and partisan opinions of the experts than to the objective data they provide. Petitioner's earnings and return ratios throughout 1981 to 1988 were relatively consistent. Petitioner never experienced a loss and, from 1986 to 1988, demonstrated a consistent rise in its net earnings and its return ratios. Petitioner was a solid enterprise that consistently provided above average, though not exceptional, returns to its shareholders. These returns should be considered in light of the declining markets for metalworking equipment and motor vehicle parts, which were the products of a number of petitioner's subsidiaries. General economic conditions may affect a company's performance and, thus, the extent, if any, of the employee's effect on the company. Mayson Manufacturing Co. v. Commissioner, supra.Although some of petitioner's subsidiaries experienced declines over the 8-year period, continued profitability of Western and Burro were responsible for positive earnings of petitioner in *467 1987 and 1988. A company's dividend policy is another factor to be considered in determining whether compensation paid to an employee was reasonable. If shareholders are receiving an adequate return on their investments, this is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. The failure to pay more than minimal dividends may suggest that some of the amounts paid as compensation to the shareholder-employee are a dividend. Owensby & Kritikos, Inc. v. Commissioner, supra at 1322-1323. Petitioner argues that its history of paying substantial dividends is strong evidence that it was financially secure and that Boren received a reasonable amount of compensation in relation to the services he performed. Respondent fails to address petitioner's dividend policy other than to comment that perhaps petitioner exercised poor business judgment in paying so much in dividends. Respondent's assertion *468 is not compelling. Petitioner cites certain of the numerous memorandum opinions of this Court concerning reasonable compensation determinations and attempts to make comparisons to compensation paid by petitioner and compensation allowed by the Court. As those cases illustrate, however, each involves different facts and different evidence. Although relevant factors may be extracted from cases, the use of financial ratios or salary levels cannot be transported from one record to another and relied on as evidence. It is significant in this case that Boren testified as follows: Q I want to get a feel, Mr. Boren, if I could, for your basic compensation policies at Avis. What connection does performance have with your compensation policies? A 90 percent. Q What is the other 10 percent? A The other 10 percent is a flat salary. Q How do you compensate for performance? A We have a criteria that we need 10-percent return on sales. While Avis doesn't reach that, there are always many reasons. Labor is difficult, breakdown of machinery and equipment. We constantly use Value Line peer group as examples. And we look at cash flow. We look at debt retirement. We particularly look at inventories. *469 And we look at the profits that they make, including all those elements, and make a decision on how their performance is done.
Notwithstanding the Court's suggestion at trial, petitioner's brief ignores the criteria stated by Boren--apparently because the large amounts paid in 1988 cannot be justified on the basis of performance as defined by Boren. Therefore, petitioner's contention that the amounts paid are reasonable based on performance is not persuasive. Comparable Compensation
Another relevant factor to consider is a comparison of compensation paid by petitioner with that paid by similar companies for similar services. Sec. 1.162-7(b)(3), Income Tax Regs. Industry standards are important in determining whether compensation is reasonable. See L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187. Both parties presented expert testimony as to what a like enterprise would pay for like services. Hakala conducted an analysis of 25 public companies that were involved in industries similar to those of petitioner. Hakala concluded that the market evidence suggested a range of reasonable total compensation for the highest paid executive *470 officer of petitioner of between $ 190,000 and $ 750,000, with an adjusted mean and median of approximately $ 380,000 to $ 400,000. Hakala also conducted a comparable analysis of compensation paid to the second-highest ranking officer in his sample of 25 guideline companies. Hakala concluded that the mean total compensation would be $ 224,000, with a range of $ 107,000 and $ 470,000. Hakala maintained, however, that, because these compensation levels were for full-time officers, Doermer's compensation level would have to be significantly lower. Kesner obtained survey data from the 1988/1989 ECS Top Management Report (ECS) for the durable goods manufacturing industry to ascertain 1988 competitive total cash compensation, which he defined as salary and annual bonus, for the top two positions of a company the size of petitioner. This survey data was national and broad based. Kesner determined that, in 1988, a chief executive officer's range of total cash compensation would be $ 311,000 (50th percentile); $ 410,000 (75th percentile); and $ 525,000 (90th percentile). Kesner then adjusted this competitive compensation data to include long-term incentive pay, such as stock option plans. *471 Kesner's calculation of the total compensation package for a chief executive officer in 1988 in the 90th percentile was $ 1,017,000. Kesner concluded that the total cash compensation for an officer in Doermer's position in 1988 would be $ 225,000 (50th percentile); $ 288,000 (75th percentile); and $ 364,000 (90th percentile). Adjusting these compensation amounts for long-term incentive pay, Kesner determined that the compensation of an officer in Doermer's position in 1988 for the 90th percentile would be $ 606,000. According to Kesner, petitioner's superior performance justified using the comparable compensation level from the 90th percentile. Neither expert's conclusion is totally reliable. Hakala's sample size was small and, given the complexity and diversity of petitioner, the 25 companies selected by Hakala were of doubtful similarity to petitioner. Moreover, at trial, Hakala testified that, in determining the compensation paid to the executives in the guideline companies, he did not include incentive compensation unless this compensation was "realized" by the holder. In his report, however, Hakala discussed the significance of providing incentive compensation, such as stock *472 options, to executives. Due to his conservative definition of compensation, the comparables provided by Hakala may be somewhat understated. Although Kesner's comparables were from a larger sample group and included incentive pay, we are not convinced that petitioner's performance justifies its inclusion in the 90th percentile. Based on the record presented, we are persuaded that petitioner's performance warrants inclusion at the 75th percentile range. The amounts paid to Boren and Doermer for 1988 in the form of salary, $ 855,216 and $ 293,710, respectively, are not materially higher than Kesner's findings at that range. These amounts are also not substantially larger than salaries paid in earlier years. Other Considerations
A longstanding, consistently applied compensation plan is evidence that compensation is reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. It is relevant to consider whether an entity pays top dollar to all of its employees, shareholders, and nonshareholders-employees alike. Owensby & Kritikos, Inc. v. Commissioner, supra at 1330. *473 In his report, Kesner asserts that petitioner had a policy of paying compensation to its general managers at levels considerably higher than that of their industry counterparts. According to Kesner, petitioner's general managers earned approximately 60 percent more than the median pay reported in the ECS report for general managers of similarly sized businesses. Kesner also notes that McDaniel, petitioner's most successful general manager, earned four times his industry counterpart in 1988. Respondent argues that the comparisons in Kesner's report should be disregarded because there is no evidence that the general managers that were surveyed in the ECS report had the same responsibilities as petitioner's general managers. Respondent concedes, however, that petitioner may have paid its general managers compensation in excess of the norm. The deductibility of compensation by a large, publicly held corporation is seldom questioned because the corporation is usually dealing at arm's length with its employees. Id. at 1322; Boca Constr. Inc. v. Commissioner, T.C. Memo. 1995-5. Based on this premise, petitioner contends that *474 we should consider the 1982 levels of compensation paid to Boren as arm's-length compensation because nearly 80 percent of his compensation for that year was approved by independent third parties. These third parties included IGI, as the owner of Old Avis, and Narragansett, as the co-owner of Burro, Western, and Broach. Petitioner sets forth a comparison of actual compensation paid to Boren for 1982 through 1988 compared with the 1982 "base year" adjusted on a going-forward basis for the Consumer Price Index (CPI) increase for each of those years. The CPI-adjusted 1982 compensation for Boren in 1988 was, according to petitioner, $ 1,618,481. Because this amount is higher than the actual amount of compensation received by Boren for 1988 and Boren continued to provide the same services to petitioner, petitioner maintains that his compensation for 1988 was per se reasonable. Respondent argues that petitioner's arm's-length compensation analysis has several flaws. First, respondent notes that petitioner spread the insurance accruals back over 1982 to 1988, consequently inflating the compensation Boren received in years prior to 1988 and deflating his 1988 compensation. Second, respondent *475 contends that petitioner erroneously included $ 150,000 of accrued vacation pay in Boren's 1982 salary, again inflating the 1982 figure. Third, respondent maintains that 1982 compensation was not an arm's-length compensation because Narragansett's approval of compensation amounts paid to Boren and Doermer was meaningless. According to respondent, Boren was given total, unreviewed authority to allocate the total amount of bonuses authorized by the boards, which merely approved bonuses in a lump-sum amount, to individual employees, including himself and Doermer. Respondent also notes that, in 1981, Mrs. Boren and Mrs. Doermer were elected to the boards of Burro, Western, and Broach, resulting in the minority status of R. Little and A. Little. It was only after their election, respondent maintains, that compensation paid to Boren and Doermer increased substantially, in part to make up for relatively low compensation for earlier years when bank financing inhibited high compensation. Respondent further argues that the claimed arm's-length compensation paid to Boren and Doermer should be reduced by the management fees paid to Narragansett to establish parity with compensation amounts paid *476 in 1988. According to respondent, there is no evidence that R. Little and A. Little provided services to Burro, Western, and Broach warranting such fees. Thus, respondent maintains, these fees were nothing more than disguised dividends. Respondent then argues that part of the compensation received by Boren and Doermer was also disguised dividends that matched those received by Narragansett. A. Little testified about the process by which salaries were set for employees at Burro, Western, and Broach. His testimony concerning the tension between payment of satisfactory salaries to management and payment of dividends to shareholders adequately demonstrates that R. Little and A. Little did not take a passive or insignificant role in setting compensation levels. There is also evidence in the record that R. Little and A. Little began their evaluation of compensation levels in relation to company performance prior to meeting with other board members. Between the involvement of R. Little and A. Little and that of IGI in setting Boren's compensation, we are satisfied that it was arm's length. Moreover, there is no evidence in the record suggesting that the management fees received by Narragansett *477 were disguised dividends. We do not have sufficient information in the record, however, to evaluate the amount of reasonable compensation for 1982 and do not agree with petitioner that, because of the arm's-length nature of this compensation, it must have been per se reasonable. See C.T.I., Inc. v. Commissioner, T.C. Memo. 1994-82, affd. without published opinion 54 F.3d 767 (3d Cir. 1995). There is evidence supporting respondent's argument that 1982 was disproportionately high and that an earlier "base year" would be more appropriate. In any event, we are not willing to accept petitioner's premise that there must be an inflation increase to salary levels every year. See Modernage Developers, Inc. v. Commissioner, T.C. Memo. 1993-591, affd. without published opinion 52 F.3d 310 (2d Cir. 1995). Under the circumstances, and using our best judgment after weighing all of the above-mentioned factors, we believe that petitioner is entitled to a greater compensation deduction than that allowed by respondent for 1988. There is ample evidence in the record demonstrating the *478 magnitude of Boren's contributions to petitioner. Boren was chief executive officer and chairman of the board of petitioner, and his daily activities were consistent with those roles. Boren's contributions to petitioner were apparently a significant factor in petitioner's ability to weather the decline of some of its subsidiaries' industries. Even Hakala noted in his report: "Mr. Boren deserves credit for many of the operational successes within the core companies." We are satisfied that Boren was a key employee of petitioner and contributed significantly to its financial performance and growth; nevertheless, limits to compensation exist even for the most valuable employees. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325. It is undisputed that Doermer did not contribute nearly as much time to petitioner as did Boren; unlike Boren, Doermer was a part-time employee. Doermer spoke with Boren on a daily basis and reviewed financial documents from petitioner each week. There is ample evidence in the record that Doermer's banking experience and financial background significantly contributed to the successfulness of petitioner's acquisition decisions. *479 We do not believe that the part-time nature of Doermer's employment should detract from the magnitude of his contribution to petitioner. Indeed, in certain instances, a part-time officer may be worth more to a corporation than a full-time officer. Estate of Wallace v. Commissioner, 95 T.C. 525, 555 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992); Smoky Mountains Beverage Co. v. Commissioner, 22 T.C. 1249, 1254 (1954). The value of executives is in part their ability to accomplish a lot in a small amount of time. Doermer consistently received compensation that was significantly lower than that of Boren, suggesting that petitioner took the part-time nature of Doermer's employment into account in setting his salary. Although Doermer's role at petitioner was more limited than that of Boren, his financial acumen and experience significantly contributed to petitioner's complex acquisition program throughout the 1980's. We believe that the Boren/Doermer partnership was a fairly unique entrepreneurial enterprise and that the skills and experience of each partner complemented those of the *480 other. At trial, A. Little testified regarding Doermer's role: "Dick [Doermer] was very important to Leland [Boren]. With all due respect to Mr. Boren, he tends to go a little fast sometimes. Dick was the guy who, when Leland would get a little too enthusiastic about an idea, would put on the brakes." Conclusion
In reaching our best judgment on the entire record, we believe that Boren's salary of $ 855,216, paid and deducted in 1988, is within the range of reasonable compensation. See Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975). We believe that, based on the entire record, Doermer's salary, paid and deducted in 1988, in the amount of $ 293,710 is reasonable compensation. We are not persuaded that Boren's $ 100,000 bonus for 1988, the bonuses for 1987, or the insurance premium or loans forgiven fall within a reasonable allowance for compensation for 1988. These amounts were not justified, in this record, as based either on performance for 1988 or on undercompensation for earlier years. To reflect the foregoing, Decision will be entered under *481 Rule 155.