T.C. Memo. 1999-211


UNITED STATES TAX COURT


EBERL'S CLAIM SERVICE, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12385-97.                    Filed June 25, 1999.


John D. Moats, for petitioner.

David J. Mungo, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, Judge:  Respondent determined deficiencies in

petitioner's Federal income tax and penalties as follows:

| FY[1] | Deficiency | Penalty Sec. 6662(d) |
|---|---|---|
| 1992 | $1,374,783 | $274,957 |
| 1993 | 637,712 | 127,542 |

[1] Petitioner's 1992 fiscal year ended on May 31, 1993, and
its 1993 fiscal year ended on May 31, 1994.

After concessions, the issues for decision are:

1.   Whether petitioner may deduct as compensation for Kirk Eberl $4,340,000 for fiscal year 1992 and $2,080,000 for fiscal year 1993, as petitioner contends; $500,000 for fiscal year 1992 and $400,000 for fiscal year 1993, as respondent contends; or some other amount.  We hold that petitioner may deduct $2,340,000 for fiscal year 1992 and $1,080,000 for fiscal year 1993.

2.   Whether petitioner is liable for the accuracy-related penalty for substantial understatement under section 6662 for fiscal years 1992 and 1993.  We hold that it is not.

Section references are to the Internal Revenue Code in effect during the years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

## I.   FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is a Colorado corporation that had its mailing address in Lakewood, Colorado, when it filed the petition.

A.   Kirk Eberl

1.   General

Kirk J. Eberl (Eberl) is petitioner's founder, sole shareholder, and president.  Grace and Kirk Eberl have been married since 1975.

Eberl's father, Gene Eberl, was a catastrophic claims adjuster.  Catastrophic claims adjusting is the process of

determining the amount of damages suffered by an insured property owner as the result of natural or man-made disasters such as hurricanes, earthquakes, and fires. Catastrophic claims adjusters inspect property for insurance companies after a disaster and determine whether the property was damaged by the catastrophe and the monetary amount of the damage. As a young man, Eberl sometimes helped his father in catastrophic claims adjusting activities.

### 2. Employment

In 1975, Eberl was 18 years old and bought his first house. He repaired it and sold it for about twice the amount he had paid for it. From 1975 to about 1985, Kirk and Grace Eberl bought, lived in, repaired, and sold about 17 houses. Eberl also built houses, self-storage units, and condominiums.

Before 1986, Eberl occasionally worked as a claims adjuster for independent catastrophic claims adjusting companies. In 1986, Eberl began working full time as a catastrophic claims adjuster for several independent catastrophic claims adjusting companies.

### B. Petitioner

### 1. Formation

In 1987, Eberl started an independent claims adjusting business, which he operated as a sole proprietorship. Eberl knew many claims adjusters before he formed petitioner. In 1988, he incorporated petitioner. Eberl's only capital investment in petitioner was $500.

Eberl was the only member of petitioner's board of directors from June 8, 1988, through the years in issue.  Grace Eberl has been petitioner's corporate secretary and treasurer since it was incorporated.

2.  Petitioner's Business

Petitioner provides the temporary services of independent catastrophic claims adjusters to client insurance companies. Petitioner has provided independent claims adjusters for several major insurance companies, including State Farm Insurance Co. (State Farm), Safeco, Aetna Travelers, USAA, Nationwide, Prudential, National Farmers Union, and American Family.

Insurance companies pay independent claims adjusting companies a negotiated fee for each claim adjusted by the independent company.  Independent companies subcontract the adjusting work to individual claims adjusters.

Most major insurance companies have in-house claims adjusters.  They use independent adjusters only when major disasters occur.  In 1990, State Farm decided to use only its own claims adjusters.  However, 10 days after Hurricane Andrew struck in 1992, State Farm decided to use independent adjusters because its own adjusters could not handle all of the claims.  State Farm accounted for 60-70 percent of petitioner's business in fiscal years 1992 and 1993.  The rest of petitioner's work was distributed fairly evenly among other companies.  Insurance

companies' in-house claims adjusters performed about 70 percent of all claims adjusting in 1993 and more than half in 1994.

Petitioner contracted with independent claims adjusters to work as needed from time to time.  Petitioner contracted with 192 claims adjusters in calendar year 1992, 170 in 1993, and 199 in 1994.  Catastrophic claims adjusters travel extensively and are frequently away from home for long periods of time.  Adjusters could decline calls to work for petitioner if they so chose.

Petitioner contracted with individuals and insurance companies which were located throughout the United States.  Once petitioner was hired, it was required to have claims adjusters at the site of the catastrophe immediately after it occurred.

Independent claims adjusting companies typically paid their claims adjusters 60-65 percent of the fee they received from the insurance company for each claim adjusted.  In contrast, petitioner paid its claims adjusters 70 percent of the fee it received for each claim adjusted.  This helped petitioner obtain and keep the services of high-quality claims adjusters.

Petitioner issued to its independent claims adjusters Forms 1099 totaling $15,589,041 for fiscal year 1992 and $6,510,745 for fiscal year 1993.  Petitioner paid 76.2 percent of its gross receipts to claims adjusters in fiscal year 1992 and 71 percent in fiscal year 1993.

Petitioner's supervisors coordinated the adjusting activities at each work site and were liaisons between petitioner

and the insurance companies. Petitioner's supervisors did not direct the day-to-day work of its independent claims adjusters or review a significant number of the claims files handled by petitioner's independent adjusters.

Petitioner's claims adjusters usually returned the claim file to the insurance company when they finished adjusting a claim. They did not send the file to petitioner. The adjuster completed a billing sheet showing how much petitioner was to receive for the claim. The claims adjuster gave the billing sheet to the insurance company and sent a copy to petitioner.

After the insurance companies received a completed claim file, they issued one check to petitioner and one to the policyholder. Petitioner usually paid its adjusters 2 weeks after it received payments from the insurance companies.

3. Eberl's Duties

Eberl has always made all of petitioner's business decisions and supervised or performed substantially all of its managerial functions, except accounting. He was solely responsible for marketing petitioner's services to insurance companies and negotiating petitioner's contracts with insurance companies and individual claims adjusters.

From 1990 to 1994, Eberl solicited business from six to eight insurance companies, and petitioner did work for about four. Eberl spent a substantial amount of time maintaining relationships with his insurance company contacts because

petitioner's successful performance for an insurance company in one disaster did not guarantee that that company would use its services in the future.

Eberl traveled extensively to meet with insurance industry officials. In 1986 and 1987, he traveled by car because he could not afford to fly. He was away from home for months at a time in 1987 and 1988. In 1992, 1993, and 1994, Eberl was away from home about 75 percent of the time. Eberl worked long hours, often from 4:30 a.m. until midnight.

Eberl's work schedule was the most hectic right after a catastrophe. When a catastrophe occurred, he coordinated petitioner's work with the insurance companies and petitioner's claims adjusters. He discussed with the insurance companies the types and number of anticipated claims, determined which adjusters to use for which jobs, and, with the help of petitioner's office staff, contacted adjusters and coordinated the logistics of getting them to the disaster site.

### 4.  Petitioner's Employees

Eberl signed an employment agreement with petitioner on July 19, 1988.  The agreement provided that petitioner would pay Eberl a base salary and, if the board of directors approved, a bonus. The contract did not specify the amount of the base salary. Eberl's salary and bonus were set at the annual meeting of petitioner's board of directors near the end of each taxable year.

Grace Eberl was petitioner's office manager, bookkeeper, and secretary beginning in 1987.  Her employment agreement with petitioner did not specify how much she would be paid.  Her annual salary was set for the next fiscal year at each annual meeting of petitioner's board of directors.  Petitioner paid no bonuses to Grace Eberl.

Before fiscal year 1991, Kirk and Grace Eberl were petitioner's only employees.  Beginning in fiscal year 1991, petitioner employed Grace Eberl's mother, Carol Soucie (Soucie), as office manager, and some part-time clerical staff.  Soucie began to work full time around 1992.  Petitioner did not pay a bonus to Soucie in fiscal years 1992 and 1993.

### 5.  Compensation Paid by Petitioner

In 1988, petitioner sought the advice of its attorney, Richard Elrod (Elrod), certified public accountant, Mark Lehrner (Lehrner), and a financial adviser, George Volland (Volland), concerning its compensation for Eberl.  Elrod, Lehrner, Volland,

and Eberl met two or three times a year thereafter. Among other things, at those meetings they discussed Eberl's desire to have petitioner pay Eberl 20-25 percent of its revenues. Based on these discussions, Eberl believed that they thought compensation equal to 20-25 percent of petitioner's gross receipts would be reasonable.

Petitioner paid salaries and bonuses (excluding pension and profit-sharing contributions) to its officers and employees as follows:

| Fiscal year | Kirk Eberl | Grace Eberl | Soucie | Other employees |
|---|---|---|---|---|
| 1988 | $40,000 | -0- | -- | -- |
| 1989 | 608,000 | $122,000[1] | -- | -- |
| 1990 | 300,000 | 120,000 | $6,560 | -0- |
| 1991 | 190,000 | 120,000 | 16,530 | -0- |
| 1992 | 4,340,000 | 120,000 | 21,980 | $861 |
| 1993 | 2,080,000 | 120,000 | 26,190 | 6,394 |

[1] This includes $2,000 paid in November 1989 for fiscal year 1988.

Petitioner has provided health and accident insurance for Eberl since 1988. Effective May 28, 1990, petitioner started a pension plan and a profit-sharing plan for its employees. Petitioner contributed to the plan only if petitioner had profits. Petitioner contributed a total of $30,000 each year to its pension and profit-sharing plans for Eberl and for Grace Eberl. It contributed a total of $5,495 in fiscal year 1992 and $6,437 in fiscal year 1993 to its pension and profit-sharing plans for Soucie.

Petitioner and Eberl entered into a deferred compensation agreement, effective June 1, 1992, under which petitioner agreed to establish a reserve of $500,000 for each year of Eberl's service to petitioner (payable at his death, disability, or retirement) unless his total annual compensation (including salary and bonus) exceeded $1 million. Payments under this agreement were in addition to payments made under his employment agreement with petitioner. Petitioner made no contributions under the deferred compensation agreement.

Eberl's compensation, as a percentage of petitioner's total income (gross receipts less cost of goods sold plus interest income) and net income (before tax, net operating loss, and Eberl's compensation) was as follows:

| Fiscal year | Eberl's total compensation | Total income | Comp. as % of total income |
|---|---|---|---|
| 1988 | $40,000 | $72,943 | 54.8% |
| 1989 | 638,000 | 942,552 | 67.7 |
| 1990 | 330,000 | 558,178 | 59.1 |
| 1991 | 220,000 | 517,332 | 42.5 |
| 1992 | 4,370,000 | 4,862,456 | 89.9 |
| 1993 | 2,110,000 | 2,658,025 | 79.4 |

| Fiscal year | NIBTNOL[1] & comp. | Comp. as % of NIBTNOL & comp. | Eberl's salary as % of gross receipts |
|---|---|---|---|
| 1988 | $36,391 | 110.0% | 14.1% |
| 1989 | 638,000 | 100.0 | 14.7 |
| 1990 | 293,767 | 112.3 | 13.7 |
| 1991 | 222,861 | 98.7 | 8.7 |
| 1992 | 4,392,439 | 99.5 | 21.2 |
| 1993 | 2,151,935 | 98.0 | 22.7 |

[1] NIBTNOL is petitioner's net income before tax and net operating loss.

6. Petitioner's Gross Receipts and Taxable Income

Petitioner's taxable income was as follows:

| Fiscal year | Taxable income |
|---|---|
| 1988 | ($3,609) |
| 1989 | (3,609) |
| 1990 | (39,842) |
| 1991 | (36,981) |
| 1992 | (14,542) |
| 1993 | 27,393 |

Petitioner has never paid dividends.

Petitioner's net profits (i.e., profits before tax and net operating loss) as a percentage of gross receipts were as follows:

| Fiscal year | Net profits before tax and NOL | Gross receipts | Net profit as % of gross receipts |
|---|---|---|---|
| 1988 | ($3,609) | $282,682 | (1.28%) |
| 1989 | -0- | 4,141,872 | 0.00 |
| 1990 | (36,233) | 2,190,835 | (1.65) |
| 1991 | 2,861 | 2,193,708 | 0.13 |
| 1992 | 22,439 | 20,438,803 | 0.11 |
| 1993 | 41,935 | 9,168,585 | 0.46 |

Petitioner's net profits as a percentage of total income and equity were as follows:

| Fiscal year | Total income | Net profits as % of total income | Equity |
|---|---|---|---|
| 1988 | $72,943 | (4.95%) | $500 |
| 1989 | 942,552 | 0.00 | 500 |
| 1990 | 558,178 | 6.49 | 500 |
| 1991 | 517,332 | 0.55 | 500 |
| 1992 | 4,862,456 | 0.46 | 500 |
| 1993 | 2,658,025 | 1.58 | 500 |

Petitioner's annual and cumulative retained earnings were as follows:

| Fiscal Year | Annual | Cumulative |
|---|---|---|
| 1988 | ($4,655) | ($4,655) |
| 1989 | (5,750) | (10,405) |
| 1990 | (41,276) | (51,681) |
| 1991 | 4,650 | (47,031) |
| 1992 | 16,748 | (30,283) |
| 1993 | 37,098 | 6,815 |

7. General Economic Conditions

There was more work for catastrophic claims adjusters during the years in issue than in prior years because of the large number of catastrophes in 1992 and 1994. U.S. insured catastrophic losses (approximate) from 1971 to 1995 were:

| Calendar year | Amount (billions of $) |
|---|---|
| 1971 | <1 |
| 1972 | <1 |
| 1973 | 1 |
| 1974 | 2 |
| 1975 | 1.5 |
| 1976 | <1 |
| 1977 | <1 |
| 1978 | 1.5 |
| 1979 | 3 |
| 1980 | 2 |
| 1981 | 1 |
| 1982 | 2 |

|      |      |
|------|------|
| 1983 | 3    |
| 1984 | 2    |
| 1985 | 3.5  |
| 1986 | 1    |
| 1987 | 1    |
| 1988 | 1.5  |
| 1989 | 8.5  |
| 1990 | 3    |
| 1991 | 4.5  |
| 1992 | 23   |
| 1993 | 6    |
| 1994 | 17   |
| 1995 | 17.7 |

Five of the 10 most costly insured U.S. catastrophes, as of May 2, 1996, occurred in petitioner's tax years at issue, shown as follows:

| Event | Date | Amount (billions) | Occurred in petitioner's fiscal year 1992 or 1993 |
|-------|------|-------------------|---------------------------------------------------|
| Hurricane Andrew | 8/92 | $15.5 | x |
| Northridge (CA) earthquake | 1/94 | 12.5 | x |
| Hurricane Hugo | 9/89 | 4.2 | |
| Hurricane Opal | 10/95 | 2.1 | |
| Winter storms (20 States) | 3/93 | 1.3 | x |
| Oakland fire | 10/91 | 1.7 | |
| Hurricane Iniki | 9/92 | 1.6 | x |
| Texas hail storms | 5/95 | 1.1 | |
| Loma Prieta (CA) earthquake | 10/89 | 1.0 | |
| California brush fires | 11/93 | 1.0 | x |

8.  Petitioner's Federal Income Tax Returns

Lehrner prepared and signed each of petitioner's returns for fiscal years 1988 to 1993. Petitioner deducted as compensation it paid to Eberl $4,340,000 in fiscal year 1992 and $2,080,000 in fiscal year 1993.

II. OPINION

A. <u>Positions of the Parties</u>

Respondent determined that it was unreasonable for petitioner to pay Eberl more than $286,815 for services rendered in fiscal year 1992 and $234,227 in fiscal year 1993. Respondent now contends that the amounts petitioner paid in excess of $500,000 for fiscal year 1992 and $400,000 for fiscal year 1993 were unreasonable compensation, disguised dividends, and not for services to petitioner. Petitioner contends that the amounts it paid Eberl in fiscal years 1992 ($4,340,000) and 1993 ($2,080,000) were reasonable and were for services Eberl provided to petitioner.

A taxpayer may deduct payments for compensation if the amount paid is reasonable in amount and for services actually rendered. Sec. 162(a)(1). Petitioner bears the burden of proving the reasonableness of compensation it paid in excess of what respondent contends was reasonable. Rule 142(a).

B. <u>Controlling Factors</u>

Courts have considered several factors in deciding whether compensation is reasonable in amount, such as: (1) The employee's qualifications; (2) the nature and scope of the employee's work; (3) the size and complexity of the business; (4) general economic conditions; (5) the employer's financial condition; (6) a comparison of salaries paid with sales and net income; (7) distributions to shareholders and retained earnings;

(8) whether the employee and employer dealt at arm's length, and if not, whether an independent investor would have approved the compensation; (9) the employer's compensation policy for all employees; (10) the prevailing rates of compensation for comparable positions in comparable companies; (11) compensation paid in prior years; and (12) whether the employee guaranteed the employer's debt.  Rutter v. Commissioner, 853 F.2d 1267, 1271 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court dated Nov. 16, 1948; R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972).  No single factor controls. Mayson Manufacturing Co. v. Commissioner, supra.

Both parties called experts to testify about whether compensation paid to Eberl was reasonable.  Petitioner's expert was Albert S. Williams (Williams), and respondent's was James F. Carey (Carey).

We next apply the factors listed above in deciding whether compensation petitioner paid to Eberl was reasonable.

1. <u>Employee's Qualifications</u>

An employee's superior qualifications for his or her position with the business may justify high compensation. <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1158 (1980). Eberl was highly qualified for his position with petitioner. This factor favors petitioner.

2. <u>Nature and Scope of Employee's Work</u>

An employee's position, duties performed, hours worked, and general importance to the success of the company may justify high compensation. <u>Rutter v. Commissioner</u>, <u>supra</u>; <u>American Foundry v. Commissioner</u>, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972); <u>Mayson Manufacturing Co. v. Commissioner</u>, <u>supra</u>.

Eberl was responsible for the rapid growth in petitioner's gross receipts. Gerald Underwood, a catastrophe operations supervisor for State Farm during the years at issue, testified that State Farm would not have hired petitioner to adjust claims resulting from Hurricane Andrew if not for Eberl.

Eberl has at times performed or overseen virtually every task for petitioner except accounting. He made virtually every important business decision for petitioner before and during the years at issue.

Respondent contends that it is common for a CEO to work long hours, suggesting that Eberl's schedule was nothing out of the

ordinary.  We believe respondent understates Eberl's level of effort.

Michael Lawrence Melvin (Melvin) and K.D. Nunn have been catastrophic claims adjusters for more than 20 years.  They testified that many people have tried to start a business like petitioner, but they do not know anyone who has been as successful as Eberl.  Melvin formed an independent catastrophic claims adjusting company similar to petitioner, but his company went out of business in 1987 or 1988.

This factor favors petitioner.

### 3.   Size and Complexity of Business

We consider the size and complexity of a taxpayer's business in deciding whether compensation is reasonable.  Rutter v. Commissioner, supra; Pepsi-Cola Bottling Co. v. Commissioner, supra; Mayson Manufacturing Co. v. Commissioner, supra.  A company's size is measured by its sales, net income, gross receipts, or capital value.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1246 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282; E. Wagner & Son v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937).

Respondent contends that petitioner's business was simple because it sold only one service and performed few functions, none of which were complex.  Respondent points out that:  (a) Petitioner generally contracted with experienced claims adjusters who needed little or no day-to-day supervision, (b) petitioner

had few employees because its claims adjusters were independent contractors, (c) petitioner's billing and collection process was simple, and (d) petitioner solicited business from only six to eight companies from 1990 to 1994. However, respondent concedes that Eberl's excellent performance in obtaining and retaining clients for petitioner offsets the relative simplicity of its business.

Petitioner had gross receipts of more than $20 million in fiscal year 1992, and more than $9 million in fiscal year 1993. It arranged for the services of almost 200 claims adjusters during the years in issue. Petitioner's business required expertise in catastrophic claims adjusting, bidding, marketing, and management. Petitioner was responsible for getting a large number of claims adjusters located throughout the United States to disaster sites immediately. This was logistically complex. It is easy to say that founding and running petitioner was simple, but we do not think anyone who accomplished what Eberl did would find that characterization to be fair. This factor favors petitioner.

### 4. General Economic Conditions

General economic conditions may affect a company's performance and thus show the extent of the employee's effect on the company. Rutter v. Commissioner, supra; Mayson Manufacturing Co. v. Commissioner, supra.

Petitioner contends that it grew even though other independent claims adjusting companies failed. Nonetheless, petitioner benefited tremendously from the large amount of catastrophes (5 of the 10 largest in history) during its fiscal years 1992 and 1993. This factor favors respondent.

5. Petitioner's Financial Condition

The past and present financial condition of a company is relevant to deciding whether compensation was reasonable. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1157-1158.

Petitioner contends that the fact that its gross receipts increased from $282,682 in fiscal year 1988 to $20,438,803 in fiscal year 1992 and $9,168,585 in fiscal year 1993 shows that its financial condition was good. We disagree.

Petitioner's financial condition (in contrast to Eberl's) was poor. Despite having a large increase in gross receipts from fiscal year 1988 to fiscal years 1992 and 1993, petitioner had a tiny amount of profits in fiscal years 1992 and 1993, negative taxable income from fiscal years 1988 to 1992, and taxable income of only $27,393 in fiscal year 1993. Petitioner's profits in fiscal years 1992 and 1993 were substantially lower than those of comparably sized service companies.

In Alpha Med., Inc. v. Commissioner, 172 F.3d 942 (6th Cir. 1999), revg. T.C. Memo. 1997-464, the taxpayer was a medical management corporation that paid its president and sole shareholder compensation of $4,439,180. The U.S. Court of

Appeals for the Sixth Circuit held that the compensation was reasonable. However, unlike petitioner, the taxpayer in Alpha Med., Inc. was financially successful; its taxable income increased by a factor of 18, and its net worth increased by a factor of 35 in 4 years. In contrast, petitioner had negative taxable income in all years except fiscal year 1993, negative accumulated retained earnings in all years except fiscal year 1993, and low profits in fiscal years 1992 and 1993.

This factor favors respondent.

6.   Comparison of Salaries Paid With Gross and Net Income

A comparison of compensation to net income can indicate whether a corporation is disguising dividends as compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325-1326; Mayson Manufacturing Co. v. Commissioner, supra.

Eberl's compensation was 99.5 percent of petitioner's net income[1] for fiscal year 1992, and 98 percent of its net income for fiscal year 1993. Petitioner's pattern of distributing the vast majority of its net income as compensation to Eberl at the end of each year suggests that the amount of compensation paid was unreasonable. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326.

Petitioner contends that Eberl's compensation was reasonable because it had agreed to pay Eberl 20 percent of its gross

---

[1] Net income is income before tax, net operating loss, and compensation.

receipts under a contingent compensation formula. We disagree. Petitioner's purported compensation formula was at best vague. Eberl wanted compensation equal to 20-25 percent of petitioner's gross receipts,[2] and he told petitioner's tax advisers of his wish. However, this purported formula was not in petitioner's corporate minutes. While we give little or no weight to the absence of formal board resolutions in closely held corporations, Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 713-714 (1977); Reub Isaacs & Co. v. Commissioner, 1 B.T.A. 45, 48 (1924), it is noteworthy here that the purported agreement was not in writing, despite the fact that petitioner's employment and deferred compensation agreements were in writing. Petitioner did not pay Eberl 20 percent of its gross receipts during any of its fiscal years from 1988 to 1993. Eberl's compensation increased from 14.2 percent of petitioner's gross receipts in fiscal year 1988 to 23 percent in fiscal year 1993. Petitioner consistently paid Eberl almost all of the income left after it paid its claims adjusters and overhead expenses.

---

[2] Petitioner's reliance on Boca Constr., Inc. v. Commissioner, T.C. Memo. 1995-5, for the proposition that its compensation formula was reasonable is misplaced. In Boca, the taxpayer consistently applied a bonus formula each year. The bonus could not exceed the lesser of 25 percent of gross receipts or 67 percent of profits. In contrast to the instant case, the formula in Boca ensured that the owners' compensation would not deprive the taxpayer of all of its net profits. Here, Eberl's compensation caused petitioner to have no taxable income from fiscal years 1988 to 1992.

Petitioner contends that it set the amount of Eberl's pay at the end of the fiscal year because of the contingent compensation formula. We disagree. We believe Eberl decided the amount of his compensation late in fiscal years 1992 and 1993 so he could receive virtually all of petitioner's net profits as compensation. See Petro-Chem Mktg. Co. v. United States, 221 Ct. Cl. 211, 602 F.2d 959, 968 (1979) (Court inferred that bonuses paid to shareholder-employees near the end of the year which absorbed nearly all of the taxpayer's earnings were at least in part a distribution of profits); Builders Steel Co. v. Commissioner, 197 F.2d 263, 264 (8th Cir. 1952); Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987); see e.g., Rich Plan, Inc. v. Commissioner, T.C. Memo. 1978-514. The fact that petitioner made lump-sum payments to Eberl that were not allocated between salary and bonus also suggests that the payments to Eberl were in part disguised dividends. See Nor-Cal Adjusters v. Commissioner, T.C. Memo. 1971-200, affd. 503 F.2d 359 (9th Cir. 1974) (bonuses paid to officer-stockholders that were computed based on the availability of funds were distributions of earnings and thus not deductible by the taxpayer).

This factor favors respondent.

7.   Comparison of Salary to Distributions to Shareholders
     and Retained Earnings

If salaries paid to controlling shareholders are large compared to salaries paid to nonowner managers who have similar responsibilities, the salaries suggest that the amount of compensation is a function of ownership.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

The failure to pay more than a minimal amount of dividends may suggest that some of the amounts paid as compensation to the shareholder-employee is a dividend.  Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974); Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152-153 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Owensby & Kritikos, Inc. v. Commissioner, supra at 1322-1323.  However, corporations are not required to pay dividends; shareholders may be equally content with the appreciation of their stock if the company retains earnings.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; Elliotts, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1161.

Petitioner has never paid dividends.  Nonpayment of dividends in conjunction with paying contingent compensation to controlling shareholders, such as Eberl, suggests that unreasonable and excessive compensation is being paid. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d

at 182-183; <u>Perlmutter v. Commissioner</u>, 373 F.2d 45, 48 (10th Cir. 1967), affg. 44 T.C. 382 (1965).

Petitioner contends that it had no need to retain earnings and that it was reasonable for it not to do so. We are not convinced that petitioner had no need to retain earnings to help it survive if Eberl retired or became disabled or if there was less work for independent catastrophe claims adjusters. See <u>Pulsar Components Intl., Inc. v. Commissioner</u>, T.C. Memo. 1996-129 (Court found that corporation paid reasonable compensation to two of its officer/shareholders because an independent investor would have been satisfied with corporation's payment of $65,000 of dividends and additional retention of earnings as cushion for possible less profitable periods).

The prime indicator of the return a corporation is earning for its investors is its return on equity. <u>Owensby & Kritikos, Inc. v. Commissioner</u>, <u>supra</u> at 1324.

Petitioner contends that petitioner's return on equity should be based on Eberl's $500 investment, that petitioner had a return on equity for fiscal year 1992 of 3,350 percent and 1,363 percent for fiscal year 1993, and that this return on equity would satisfy an independent investor. Petitioner also contends that it did not need to pay dividends because a hypothetical shareholder would be satisfied with the appreciation in value of his or her stock due to petitioner's retention of earnings and the growth in petitioner's annual sales.

Petitioner cites no case in which the court gave significant weight to a high return on equity based on a founding shareholder's small initial investment.  Courts have relied on other financial factors when a shareholder's capital contribution is small.  See, e.g., <u>Alpha Medical, Inc. v. Commissioner</u>, 172 F.3d 942 (6th Cir. 1999), revg. T.C. Memo. 1997-464 (Court derived return on equity by comparing retained earnings for the year at issue plus the shareholder's $1,000 capital investment to retained earnings for the prior year plus the shareholder's capital investment); <u>Labelgraphics, Inc. v. Commissioner</u>, <u>supra</u> (annual return on equity may be skewed in years in which the taxpayer's equity is low); <u>H&A Intl. Jewelry, Ltd. v. Commissioner</u>, T.C. Memo. 1997-467.  We give petitioner's method for calculating return on equity[3] for fiscal year 1993 based on Eberl's $500 investment little weight in view of petitioner's small amount of accumulated retained earnings, taxable income, profits, and lack of dividends.  Finally, petitioner did not retain earnings in fiscal years 1988 to 1990 and had negative cumulative retained earnings in fiscal years 1988 to 1992; there is no evidence that the value of petitioner's stock appreciated during the years in issue; and petitioner offered no reason for its failure to pay dividends.  See <u>Owensby & Kritikos, Inc. v.</u>

---

[3] The parties disagree as to whether we compute return on equity using current or accumulated retained earnings. Resolution of this dispute does not affect the outcome of this case.

Commissioner, supra at 1326 (in deciding the reasonableness of compensation, a court may consider the absence of dividends if a profitable corporation has offered no reasons for its failure to pay dividends).

This factor favors respondent.

8.    Whether Employee and Employer Dealt at Arm's Length

The failure of the employee and employer to deal at arm's length, such as if the employee is the employer's sole or controlling shareholder, suggests that the amount of compensation paid may be unreasonable.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; Owensby & Kritikos, Inc. v. Commissioner, supra at 1322-1324.  We closely scrutinize compensation if the employee controls the employer to see whether it is something other than the purchase price of the employee's services.  Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; see also Dielectric Matls. Co. v. Commissioner, 57 T.C. 587, 591 (1972).

Eberl has been petitioner's sole shareholder and president at all times since he founded petitioner.  He set his own salary and bonus.  Eberl and petitioner did not deal at arm's length. See Estate of Wallace v. Commissioner, 95 T.C. 525, 555 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); cf. Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 121 (bonus plan established by board of directors for minority shareholders was an arm's-length transaction).

This factor favors respondent.

9.  Petitioner's Compensation Policy for All Employees

Courts have considered the taxpayer's compensation policy for its other employees in deciding whether compensation is reasonable.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  This factor focuses on whether the entity pays top dollar to all of its employees, including both shareholders and nonshareholders.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1329-1330.

Petitioner offered no evidence that its other employees (Eberl's wife and mother-in-law) were paid at or near the high end of the compensation range.  Although petitioner's adjusters were not its employees, we recognize that petitioner paid them 70 percent of the fee it received from the insurance company, compared to an industry norm of 60-65 percent.  However, the adjusters did not share in the large distribution of profits petitioner made to Eberl at the end of the fiscal year.  Thus, petitioner's payment policy for its adjusters is not similar to petitioner's payment policy for Eberl.  Cf. Home Interiors & Gifts, Inc. v. Commissioner, supra (compensation paid to the taxpayer's shareholder-employees was reasonable in part because the taxpayer had longstanding practice of paying all of its key employees on the basis of commissions).

This factor favors respondent.

10.  Prevailing Rates of Compensation for Comparable
     Positions in Comparable Companies

In deciding whether pay is reasonable, we compare it to
compensation paid to persons holding comparable positions in
comparable companies.  Rutter v. Commissioner, 853 F.2d at 1271;
Mayson Manufacturing Co. v. Commissioner, supra at 119.

Neither respondent's expert, Carey, nor petitioner's expert,
Williams, had data from businesses that are similar to petitioner
or executives whose performance was shown to be similar to
Eberl's.  Pulsar Components Intl., Inc. v. Commissioner, supra
(Court not persuaded by expert testimony that did not compare
prevailing rates of compensation for comparable positions in
comparable companies); Mad Auto Wrecking, Inc. v. Commissioner,
T.C. Memo. 1995-153 (same).

Respondent contends that petitioner could have hired someone
to perform all of Eberl's services for $500,000 per year.
Respondent's contention is speculative.

This factor is neutral because neither respondent's nor
petitioner's experts had persuasive comparative pay data.

11.  Compensation Paid in Prior Years

An employer may deduct compensation paid in a year for services rendered in prior years.  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); R.J. Nicoll Co. v. Commissioner, 59 T.C. at 50-51.  To currently deduct amounts paid as compensation for past undercompensation, a taxpayer must show:  (a) That it intended to compensate employees for past services from current payments, and (b) the amount of past undercompensation.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, supra at 553-554.

Petitioner's records show that Eberl's compensation in fiscal years 1992 and 1993 was not catchup pay.  The minutes for the annual board meetings authorizing petitioner to pay Eberl's salary and bonus for fiscal years 1992 and 1993 state that Eberl was paid "for the current year" and do not indicate that any of the payment was for prior years.  See Pacific Grains, Inc. v. Commissioner, supra (corporate president was not underpaid in part because taxpayer's board did not state that some part of the payments were for his prior services); H&A Intl. Jewelry, Ltd. v. Commissioner, T.C. Memo. 1997-467 (pay was not catchup pay where minutes from shareholder meetings showed that the compensation for the current year was not intended to reward the employee's efforts for prior years).

Petitioner paid Eberl less than 20 percent of its gross receipts in fiscal years 1988 to 1991 and more than 20 percent in fiscal years 1992 and 1993.  Petitioner contends that its payments to Eberl in fiscal years 1992 and 1993 in excess of 20 percent of its gross receipts were intended to compensate him for services in petitioner's early years.  We disagree.  We do not believe that Eberl was underpaid in prior years.  The fact that Eberl received less than he wanted from fiscal years 1988 to 1991 does not establish that he was underpaid.  Cf. Alpha Medical, Inc. v. Commissioner, supra (the shareholder had been underpaid for past services because he had received but rejected an offer paying more than $1 million annually); Comtec Systems, Inc. v. Commissioner, T.C. Memo. 1995-4 (corporation's president and vice president were underpaid for past services where both had accepted low wages (and the vice president received no pay for 6 years) until the corporation was successful).

We conclude that none of the 1992 and 1993 compensation in issue was catchup pay.  This factor favors respondent.

12.  Whether Employee Guaranteed Taxpayer's Debt

In deciding whether compensation is reasonable, courts have considered whether the employee personally guaranteed the employer's debt.  See R.J. Nicoll Co. v. Commissioner, supra at 51.  Petitioner had no debt.  This factor does not apply here.

13.  Conclusion

Petitioner's increase in gross receipts resulted not only from the huge volume of catastrophic claims work during the years in issue, but also from Eberl's long hours, personal contacts, and his knowledge of the catastrophic claims business.  It would be reasonable for petitioner to compensate him well for that work.  However, the problem from petitioner's stand point is that Eberl chose to leave petitioner with virtually nothing to show for his work.  Carey testified that it would be reasonable to expect petitioner to have pretax earnings of about $2 million for fiscal year 1992 and about $1 million for fiscal year 1993.  Carey acknowledged that if petitioner had retained earnings of $2 million in fiscal year 1992, it would still have had $2,340,000[4] to pay Eberl, and that compensation to Eberl of $2,340,000 in that year might be reasonable.  Carey did not change his conclusion that it would be unreasonable to pay Eberl more than $500,000 in fiscal year 1992 and $400,000 in fiscal year 1993, but neither Carey nor respondent gave any convincing reason why petitioner should have retained more than $2 million in earnings. This suggests that reasonable compensation to Eberl for fiscal year 1992 could be as much as $2,340,000, the difference between the amount paid to Eberl ($4,340,000) and the amount of retained

---

[4] Carey said $2,200,000, not $2,340,000.  However, the record shows that $2,340,000 is the correct amount ($4,340,000 - $2,000,000 = $2,340,000).

earnings Carey said it would have been reasonable for petitioner to have ($2 million). Applying Carey's analysis to fiscal year 1993, reasonable compensation to Eberl could be as much as $1,080,000 (the difference between the amount petitioner paid Eberl ($2,080,000) and the amount of retained earnings Carey said would have been reasonable for petitioner to have ($1 million)).

Other facts present here support a finding that compensation to Eberl in excess of those amounts would be unreasonable. Eberl set his own compensation, which was not the result of an arm's-length agreement; petitioner retained a minimal amount of earnings and distributed almost all of its profits to Eberl at the end of the year; and petitioner's other employees and independent adjusters did not receive yearend bonuses. These facts suggest that a substantial part of Eberl's compensation was a disguised dividend and not purely for services. We conclude that $2,340,000 for fiscal year 1992 and $1,080,000 for fiscal year 1993 constituted reasonable compensation to Eberl for those years. See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. at 568 (the Court must decide the amount of reasonable compensation where the taxpayer proves the Commissioner's determination to be wrong).

C.    Whether Petitioner Is Liable for the Penalty Under Section 6662 for Substantial Understatement

Respondent determined that petitioner is liable for the accuracy-related penalty for substantial understatement for fiscal years 1992 and 1993 under section 6662.

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence or substantial understatement of tax.  Sec. 6662(a), (b)(1) and (2). A substantial understatement of income tax occurs when the amount of the understatement for a taxable year exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000 in the case of a corporation.  Sec. 6662(d)(1)(A).  The accuracy-related penalty does not apply to any part of an underpayment if the taxpayer shows that there was reasonable cause and that the taxpayer acted in good faith.  Sec. 6664(c)(1).  Reliance on the advice of a professional, such as an accountant, may constitute reasonable cause if, under all the facts and circumstances, that reliance is reasonable and the taxpayer acted in good faith.  Sec. 1.6664-4(c), Income Tax Regs.

Respondent contends that petitioner did not have substantial authority or reasonable cause for deducting the compensation paid to Eberl because petitioner's tax advisers were not executive compensation specialists and because they did not advise petitioner that the amounts it actually paid Eberl were reasonable compensation.  We disagree.

Based on his discussions with petitioner's advisers, Eberl reasonably believed that compensation equal to 20-25 percent of petitioner's gross receipts would be reasonable. Lehrner signed petitioner's tax returns for the years in issue, which suggests that Eberl believed Lehrner thought Eberl's compensation was reasonable. See <u>Bokum v. Commissioner</u>, 94 T.C. 126, 148 (1990) (accountant's failure to sign the tax return should have put the taxpayer on notice that he was not backing the advice embodied in the return). We hold that petitioner's reliance was reasonable cause for deducting the compensation it paid to Eberl.[5]

To reflect the foregoing and concessions,

<u>Decision will be entered under Rule 155</u>.

---

[5] Also, petitioner is not liable for the substantial understatement penalty for fiscal year 1992 because it adequately disclosed the facts relating to Eberl's compensation on its 1992 return. Sec. 6662(d)(2)(B)(ii). Rev. Proc. 92-23, 1992-1 C.B. 737, sec. 4(b)(4), 1992-1 C.B. 738, provides that, for purposes of reducing the understatement of income tax under sec. 6662(d), additional disclosure of facts relating to an issue involving reasonable compensation is unnecessary, if the Form 1120, Schedule E, Compensation of Officers, has been properly completed. Petitioner included a properly completed Schedule E concerning Eberl's compensation in its 1992 return.